IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,529

STATE OF KANSAS,
*Appellee*,

v.

LUIS ANTONIO AGUIRRE,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 60-405 applies to scenarios involving the exclusion of evidence, not a ruling that evidence may be admissible for impeachment.

2.

Under the facts of the case, the defendant's statements, though obtained in violation of *Miranda*, were voluntary and could be used for purposes of impeachment.

3.

Relating to the admissibility of expert testimony, the 2014 legislative amendments to K.S.A. 60-456(b) embraced the analytical framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

4.

When faced with a challenge to a district court's decision to admit or exclude expert testimony under K.S.A. 2020 Supp. 60-456(b), an appellate court must evaluate

for abuse of discretion whether the district court properly performed its gatekeeper role: First, by use of the correct legal standard governing the admissibility of expert testimony; and second, by application of that standard in evaluating whether (a) an expert is qualified to render an opinion and (b) the opinion is sufficiently relevant and reliable. The "legal standard" aspect of the gatekeeper role considers whether court action was based on an error of law, while the "application" aspect of the gatekeeper role considers whether the district court committed an error of fact or acted arbitrarily or unreasonably.

5.

Here, the district court abused its discretion by allowing unreliable expert testimony concerning the length of time in which a grave lay open to the sky. However, on the facts of the case, the State adequately demonstrated that this error was harmless.

6.

A conviction cannot be sustained by a necessary presumption based only on other presumptions, i.e., inference stacking.

7.

On the facts of the case, no inference stacking was required to find that the defendant killed a one-year-old child with premeditation, although no direct evidence was presented as to the identity of the child's killer, the manner of the child's death, and the timing of the child's death. Nor did the district court's error in allowing unreliable expert testimony about the length of time in which a grave lay open affect the sufficiency of the evidence supporting the jury's finding that the child was killed with premeditation.

2

8.

A district court's decision about the enforceability of a prior trial's stipulation in a subsequent trial against the same defendant is reviewed for abuse of discretion

9.

Evidentiary stipulations are generally binding during subsequent trials (or retrials) unless expressly limited by their own terms.

10.

Under the facts of the case, a jury instruction on inference stacking was not factually appropriate because there was no real danger that the jury would be required to stack inferences in order to reach its conclusions. While the factual record must be evaluated in a light most favorable to the defendant, pure speculation cannot backfill an evidentiary absence to render a speculative, cautionary jury instruction factually appropriate.

11.

Under the facts of the case, the prosecutor committed no prosecutorial error.

12.

The district court had jurisdiction to convict the defendant of two lesser included offenses, despite only being charged with one count of capital murder based on two killings. The interpretation of the relevant statutes set forth in *State v. Martis*, 277 Kan. 267, 276-79, 83 P.3d 1216 (2004), is approved.

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed April 23, 2021. Affirmed.

*Clayton J. Perkins,* of Capital Appellate Defender Office, argued the cause, and *Meryl Carver-Allmond*, of the same office, was with him on the briefs for appellant.

*David Lowden*, deputy county attorney, argued the cause, and *Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: The present appeal represents Luis Antonio Aguirre's second appearance before this court. In *State v. Aguirre*, 301 Kan. 950, 349 P.3d 1245 (2015) (*Aguirre I*), a majority of the court reversed a prior jury verdict finding Aguirre guilty of capital murder in these two deaths based on the district court's failure to suppress his confession, which, the majority concluded, was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Following a new trial on remand, a jury convicted Aguirre of voluntary manslaughter in the death of his ex-girlfriend, T.M., and of first-degree premeditated murder in the death of J.M., their one-year-old son. Aguirre again appeals. This time, although we conclude that Aguirre has identified error in the district court's decision to admit certain expert testimony, we find that the error was not reversible. Finding no other errors, we affirm Aguirre's convictions.

## FACTS

In September 2007, T.M. and her one-year-old son, J.M., left a homeless shelter in Chicago. A month later, their bodies were discovered in a shallow grave near Ogden, Kansas. Following several leads, law enforcement eventually brought Aguirre in for

4

questioning. After additional investigation, the State of Kansas charged Aguirre with one count of capital murder for the two deaths. (A more detailed recitation of the facts was presented in *Aguirre I*.) We will discuss additional evidence presented at the second trial where pertinent to the issues.

The jury ultimately convicted Aguirre of voluntary manslaughter in the death of T.M. and of premeditated first-degree murder in the death of J.M. Aguirre appealed.

ANALYSIS

Aguirre raises eight issues for our consideration.

*Voluntariness of Aguirre's statements to law enforcement*

Aguirre first claims that his statements made to law enforcement after invoking his *Miranda* rights were involuntary. He asserts the district court erred in ruling that these statements were voluntary and could be used for impeachment purposes—though they were not, ultimately, presented to the jury.

*Standard of Review*

"An appellate court employs the same standard of review for determining the voluntariness of the waiver of *Miranda* rights as it does for assessing the voluntariness of a defendant's statement. The inquiry requires an examination of the totality of the circumstances, and an appellate court reviews the factual underpinnings of the trial court's decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." *State v. Mattox*, 280 Kan. 473, Syl. ¶ 3, 124 P.3d 6 (2005).

5

The State bears the burden to establish voluntariness by a preponderance of the evidence. *State v. Guein*, 309 Kan. 1245, 1259-60, 444 P.3d 340 (2019).

"The essential inquiry is whether the statement was the product of an accused's free and independent will. The court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors: '(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.'" *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

However, these factors are not merely to be tallied up against one another, and any one factor may be sufficient to find that a confession was involuntary. *Guein*, 309 Kan. at 1260 (quoting *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 [2009]). In evaluating voluntariness, "'an appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.'" *State v. Bridges*, 297 Kan. 989, 1004, 306 P.3d 244 (2013) (quoting *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 [2005]).

*Additional Facts*

During his first interview, Aguirre mentioned his need to return a child in his care to the child's family after the detectives revealed that T.M. was dead. The *Aguirre I* court set forth the relevant portion of the interview at length. See 301 Kan. at 955-56, 959-61. Aguirre said that once the child was with his family, "I will be here as long as you want me to afterwards." The detectives immediately assured Aguirre that the child would be taken care of and continued asking questions. Aguirre then stated: "This is—I guess

6

where I, I'm going to take my rights and I want to turn in [the child] to his family and I'll be back here. I mean, I would like to keep helping you guys I just want to—."

At this point in the interview, the *Aguirre I* court held Aguirre had invoked his rights, therefore further interrogation violated *Miranda*. Before the second trial, both parties filed motions seeking a ruling on the voluntariness of statements Aguirre made to law enforcement after this point in the interview. The State sought to use these statements if Aguirre were to "take the stand and testify inconsistent with what he told the police in his un-Mirandized portion." After a hearing, the district court found these statements to be voluntary and admissible for impeachment purposes.

*Discussion*

The State first argues that Aguirre failed to preserve this issue by failing to make a proffer of the evidence that he would have presented if the district court had ruled that his statements were involuntary. K.S.A. 60-405 states:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

Aguirre correctly counters that K.S.A. 60-405 applies to scenarios involving the *exclusion* of evidence, not a ruling that evidence may be admissible for impeachment. For preservation purposes, this is important. "Failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion." *State v. Evans*, 275 Kan. 95, 100, 62 P.3d 220 (2003). Here,

7

however, the record provides ample grounds to determine whether Aguirre's statement was voluntary.

Turning to the merits, Aguirre claims that his post-invocation statements during the first interview were involuntary because officers continued to question him after he invoked his *Miranda* rights, analogizing his case to the "bait and switch" tactics in *State v. Swindler*, 296 Kan. 670, 681, 294 P.3d 308 (2013), which lends credence to his argument because of the "added pressure" of the child in his care, whose "cries could be heard inside the interrogation room." Aguirre also references the *Aguirre I* majority's comment that this "was a case where the interrogators simply refused to scrupulously honor the suspect's right to cut-off questioning but instead coerced the suspect to continue the interrogation until they had the confession they sought." 301 Kan. at 960.

The State correctly counters that *Aguirre I* is not dispositive of this issue. The *Aguirre I* majority's decision not to analyze the voluntariness of Aguirre's post-invocation statements consigns any reference to "coercion" in that opinion to the realm of dicta, at best. See 301 Kan. at 963.

We are also unpersuaded by Aguirre's analogy to *Swindler*, which we find to be distinguishable. In *Swindler*, the court found a defendant's confessions involuntary based solely on "the unfairness of the officers in conducting the interrogation—specifically, their assurances that he was free to terminate the interrogation and leave at any time contrasted with their refusal to honor those assurances." 296 Kan. at 680. The court found it was "obvious that Swindler wanted to terminate the interview and leave the KBI office" "[f]rom the time that he said 'I'm done. I want to go home. I'm done.'" 296 Kan. at 681. The court also noted the presence of Swindler's girlfriend and two young children, and Swindler's desire to go to work to earn money for them, but the court's overall focus lay

8

on the detectives' conduct: "The message of these investigators was unmistakable: If Swindler wanted to stop talking and leave, he needed to confess." 296 Kan. at 681.

In contrast, Aguirre never asked the detectives to stop the interrogation altogether. At most, he asked for a temporary cessation, after which he would "be here as long as you want me to afterwards," "be back here," and that he "would like to keep helping you guys." Thus, Aguirre was not placed in the position of being forced to confess so he could be returned to the child who had been in his care.

On balance, we do not find the detectives' actions during their first interview with Aguirre to be unfairly coercive in light of the totality of the circumstances. Aguirre voluntarily went to the police station without any threats by law enforcement. When the at-issue exchange arose, the detectives admittedly proceeded on with questioning, rather than inquire as to whether Aguirre was actually invoking his rights, but they responded directly to Aguirre's expressed concerns by assuring him the child would be returned to his family safely. And because Aguirre's claim that his statements during his second interview were involuntary is based solely on the assumption that his post-invocation statements at the first interview were involuntary, we likewise find that Aguirre's statements at the second interview were made voluntarily.

*The district court's admission of Dr. Tomb's "open grave" expert testimony*

Aguirre next argues that the district court erred in allowing Dr. Andrew Tomb to give an opinion on the length of time during which the grave of T.M. and J.M. was open, claiming Dr. Tomb's testimony consisted of "junk-science," and that the district court failed its gatekeeping function under K.S.A. 2020 Supp. 60-456(b).

9

*Standard of Review*

The admission of expert testimony "is generally reviewed for an abuse of discretion," although, "[t]o the extent interpretation of statutes is concerned, review is de novo." *State v. Lyman*, 311 Kan. 1, 21, 455 P.3d 393 (2020), *cert. denied* 141 S. Ct. 174 (2020).

> "A court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the court; (2) based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. The party arguing an abuse of discretion bears the burden of establishing that abuse. *Corbin I*, 305 Kan. at 622." *State v. Corbin*, 311 Kan. 385, 390, 461 P.3d 38 (2020).

Prior to its amendment in 2014, K.S.A. 60-456 required courts to assess the admissibility of expert testimony under the standard articulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), i.e., "that, to be admissible, expert opinion testimony had to be generally accepted as reliable within the expert's particular field." *In re Care & Treatment of Cone*, 309 Kan. 321, 326, 435 P.3d 45 (2019). But in 2014, the Kansas Legislature amended K.S.A. 60-456(b), embracing the analytical framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In so doing, the statute now states as follows:

> "(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or

10

data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case." K.S.A. 2020 Supp. 60-456(b).

Under this framework, a district court is required to act as an evidentiary gatekeeper by assessing the reliability and relevancy of expert testimony in a particular case under a number of nonexclusive factors, including:

"(1) [W]hether the theory or technique can be (and has been) tested; (2) whether it has been subject to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique has general acceptance within a relevant scientific community." *Lyman*, 311 Kan. at 22.

We have not yet articulated the standard of review by which an appellate court assesses a district court's performance of its gatekeeping function. In *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 493, 369 P.3d 966 (2016), a panel of the Kansas Court of Appeals formulated the relevant inquiry this way:

"We review de novo whether the district court actually performed its gatekeeper role in the first instance and whether it applied the proper standard in admitting expert testimony. Here, the district court performed its gatekeeper role by reading the briefs on the motion to strike, conducting a hearing, and ruling on the reliability of the challenged testimony. The parties do not allege the district court applied an improper standard in excluding expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), teaches that *Daubert* is not talismanic; it simply means that prior to admitting expert testimony, the court must insure the testimony 'is not only relevant, but reliable.' . . .

11

"Where, as here, the district court performed its gatekeeper role and applied the proper legal standard, we review for abuse of discretion the district court's decision to admit or exclude the testimony. [Citations omitted.]"

In analyzing whether discretion was abused, the *Smart* panel instructed that a district court is required first to assess "whether the expert is qualified 'by knowledge, skill, experience, training or education' to render an opinion." 52 Kan. App. 2d at 494. Second, a district court must evaluate whether the proposed expert testimony is relevant and reliable by determining "whether the testimony 'is based on sufficient facts or data,' and is 'the product of reliable principles and methods,' and whether 'the witness has reliably applied the principles and methods to the facts of the case'" as required by K.S.A. 2020 Supp. 60-456(b). 52 Kan. App. 2d at 494-95.

Both *Smart* and federal caselaw have also recognized that "reliability concerns may focus upon personal knowledge or experience instead of the *Daubert* factors and scientific foundation." *Smart*, 52 Kan. App. 2d at 495; see also *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018) ("Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to 'the nature of the issue, the expert's particular expertise, and the subject of [the] testimony.'") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-50, 119 S. Ct. 1167, 143 L. Ed. 2d 238 [1999]). As the *Smart* panel noted, "'To the extent a witness is relying primarily on experience, he or she "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."'" 52 Kan. App. 2d at 495 (quoting *Seifert v. Unified Gov't of Wyandotte County*, No. 11-2327-JTM, 2016 WL 107932, at *1-2 [D. Kan. 2016]).

12

We have cited *Smart* with approval previously when faced with a district court's decision to admit or exclude expert testimony under the post-2014 version of K.S.A. 60-456(b), and again do so here. See, e.g., *Lyman*, 311 Kan. at 23. However, we think that both components of the analysis articulated by the *Smart* panel—(1) whether the district court actually performed its gatekeeping role using the proper standard, and (2) how it applied the standard—fall under separate aspects of our abuse of discretion analysis: the former raising the question of whether the district court committed an error of law, and the latter raising a question of whether the district court committed an error of fact or acted arbitrarily or unreasonably. Thus, when faced with a challenge to a district court's decision to admit or exclude expert testimony under K.S.A. 2020 Supp. 60-456(b), an appellate court must evaluate for abuse of discretion whether the district court properly performed its gatekeeper role:

- First, by use of the correct legal standard governing the admissibility of expert testimony; and
- Second, by application of that legal standard in evaluating whether (a) an expert is qualified to render an opinion and (b) the opinion is sufficiently relevant and reliable.

Having thus clarified our analytical framework, we must first discuss the specifics of Dr. Tomb's testimony at both trials and the district court's decision to admit it at the second trial.

*Additional Facts*

At trial, the State presented expert testimony from Kansas State botanist Dr. Tomb. Dr. Tomb testified about the condition of the vegetation upon which the bodies

13

were placed and also described in great detail the contents of some "plugs" of biological material he obtained from beneath where the bodies were discovered. The material consisted essentially of box elder leaves, neatly stacked one on top of the other, forming three to seven layers of leaves. The plugs also included mold and bacteria that were consuming or otherwise breaking down the materials. Dr. Tomb gave his opinion on how long the bodies had been in the grave and also the length of time that must have elapsed between the time the grave was dug and the time the bodies were deposited on top of the leaves, being a minimum of some hours.

It is the opinion specifically related to that time lapse—called the "open grave" opinion—to which Aguirre objects. Aguirre attacked Dr. Tomb's qualifications as an expert under K.S.A. 2020 Supp. 60-456(b), citing the 2014 legislative change to the statute.

Before trial, the district court held what it characterized as "the *Daubert* hearing." At this hearing, Aguirre called Dr. Christopher Palenik as his sole witness. Dr. Palenik disagreed with Dr. Tomb's assessment that there was "an obvious layer of leaves" present in the gravesite, questioning the sample Dr. Tomb selected for his analysis. Dr. Palenik criticized Dr. Tomb's methodology and the thoroughness of his documentation in obtaining samples of leaves from the grave, ultimately opining that Dr. Tomb did not acquire a sufficient sample and did not establish a "control sample" of how many leaves would be "actually present at that level in the earth" as a baseline. Dr. Palenik further noted that the presence of additional plant material beyond the leaves suggested "another mechanism for how leaves are ending up in the grave besides just fall [sic] from the canopy."

14

Dr. Palenik was aware of no studies on the rate of leaf fall in box elder trees. He further noted a number of additional uncertainties with Dr. Tomb's analysis, including uncertainty as to the size of the open area of the grave, the number of leaves on the trees at the time, the maturity of those leaves, the wind speed, the number of leaves already on the ground, and the possibility of various "mechanisms" for the distribution of the leaves already on the ground. Dr. Palenik thus believed an "incredibly complex model" would be needed to extrapolate the amount of time the grave sat open based on the presence of any number of leaves. Accordingly, Dr. Palenik opined that Dr. Tomb's opinion was unsupported "by science."

Dr. Tomb also testified. He noted that the grave lay beneath the canopies of two box elder trees. He visited the grave "shortly after" the bodies had been removed. Focusing on the portion of the grave that had been "under the adult female, essentially in the midline, from the head to the pelvis," which "had been protected by the body from the animal digging," Dr. Tomb pulled four "plugs" of material—roughly 2.5 to 3 inches—for analysis. He observed the samples both with a microscope and by "digging them out" and looking at them with the naked eye.

Dr. Tomb characterized his work as "descriptive science," as opposed to "experimental science." He claimed that the condition of the leaves present in the samples was inconsistent with the leaves appearing in the grave by some mechanism other than falling into the open grave. Dr. Tomb described his observational techniques as being "more like a paleobotanist" based on his need "to dig down through and expose plant material." Dr. Tomb disputed the notion that there could be a "control" for "a natural history fact," as he wasn't performing an experiment.

15

Dr. Tomb had never before given an opinion on the length of time in which a grave was open. Although he had "done a lot of digging to try to find out about how fast box elder loses its leaves," he never located a study on the subject. Nevertheless, Dr. Tomb "found out more about how long [box elder trees] in general, lost their leaves," noting that "it wasn't precipitous." Dr. Tomb noted that the two box elder trees above the grave appeared to have lost their leaves at different rates, with one tree having almost no leaves by the time he observed it.

Dr. Tomb recognized that a number of factors could affect the rate at which box elder trees shed leaves, opining that it would be impossible to determine the precise time interval over which the trees in question lost their leaves in September or October of 2009. Dr. Tomb did review the weather information, but he did not analyze it "very deeply"; though he noted "that there were winds," the absence of a frost appeared more significant to him than wind speed. Dr. Tomb further recognized that wind speed could affect leaf fall, but he "didn't know which day to check" for wind speeds.

The district court ultimately found that Dr. Tomb was "qualified" in his field. The district court went on to contrast the "experimental" science described by Dr. Palenik with the "historical" science on which Dr. Tomb relied, noting that, with Dr. Tomb's process, "You're simply making observations of historical data based upon the science of botany, his expertise field." The district court further found that Dr. Palenik's various criticisms—which the court referred to as "side issues"—went to the weight, not the admissibility, of Dr. Tomb's opinion.

Aguirre's counsel then filed a motion asking the court for more specific findings of fact and conclusions of law. The district court took up Aguirre's motion prior to the parties' opening statements. As a prelude, the district court maintained that it believed it

16

"had previously made sufficient findings," but went on to clarify that both Dr. Tomb and Dr. Palenik were "extremely qualified in their fields." Further:

> "That Dr. Tomb is an expert in the—with specialized knowledge in the scientific field of botany, and that as a result of that he has specialized knowledge about the field of botany, and particularly box elder leaves and box elder trees. That his testimony would assist a jury.
>
> "The, I guess criticism from the motion and everything perhaps goes to the weight and credibility, but as Dr. Tomb testified to, the science that he was referring to was one that cannot be duplicated in a laboratory, and many scientific tests can be, as I think his indicated it wasn't a scientific test but it was—or scientific facts but it was a scientific observation of findings based upon his training and experience.
>
> "For those reasons I believe—well, those reasons I am allowing him to testify as to his specialized knowledge of the—in the field of botany as it specifically relates to the trees and shrubs that were in the area of where the bodies of [T.M.] and [J.M.] were found."

When Aguirre's counsel clarified that the objection lay in Dr. Tomb's testimony as to the length of time in which the grave sat open, the court responded:

> "I understand that, and I will allow him to testify based upon his observations and his—he took the leaves back to the lab, as I recall, examined them under a microscope. I will allow him to express an opinion as to how long it potentially could have been open. I think there was a window, and obviously there were many variables that could affect all of that, and I think he acknowledged that."

At trial, Dr. Tomb opined that the grave was four to six weeks old as of the date it was discovered. He again described the two box elder trees whose limbs stretched above

17

the grave. He told the jury that "[t]he literature on box elder [trees] is that leaf abscission occurs from the fall through into the winter." He clarified that, although "[t]he literature is sparse," "there's no mention of it being like ginkgo, or like—even like hackberries or elms like where there is a noticeable cascade of leaves coming off those trees." Dr. Tomb also described his process in sampling the leaves that had been beneath the bodies in the grave, in processing the samples, and in identifying the contents.

Based on his observations of the samples, Dr. Tomb opined that "there wasn't anything in the grave other than box elder leaves" and that there were "at least eight or nine leaflets that would be in different layers and attached within the specimen." He further opined that, "[W]hen you find this many leaves, it's indicative of a time interval," later clarifying that he believed the grave must have been open "a day as a minimum, and several days is even more likely [before the bodies were interred] based on how many leaves there are and the way the box elder loses its leaves." Dr. Tomb discounted the idea that strong winds could have contributed significantly to the amount of leaves in the grave, noting that he didn't believe "that these leaves came from anyplace other than the trees above . . . the grave."

Aguirre's counsel cross-examined Dr. Tomb at length about the possible holes in his analysis and method. Aguirre's attorney further highlighted Dr. Tomb's inexperience with forensic science and with leaf fall studies. Dr. Palenik also identified a number of problems with Dr. Tomb's analysis and opinion, from Dr. Tomb's method of collecting samples to the uncertainties surrounding his ultimate conclusion. Ultimately, Dr. Palenik testified that an opinion could not be formed as to the amount of time the grave was open from the information available to Dr. Tomb.

In closing arguments, the prosecutor offered the following commentary on Dr. Tomb's testimony:

"Dr. Tomb gives his opinion that the grave was open for at least twelve hours. That's in his opinion, the grave was open for at least twelve hours, and the defense has spent a lot of time challenging this opinion. And they have called Dr. Palenik, which they certainly have the right to do, in to say that Dr. Tomb's opinion wasn't scientific enough. But this is where you can use your common knowledge and experience, your common sense, and evaluate the evidence.

"The defendant isn't gonna dig a grave in the middle of the day, and it isn't smart to dig a grave while you have the bodies right there. Doesn't it make sense that the defendant dug the grave on the night of the 21st, and then waited til the next night on the 23rd, and then on midnight 22nd, 23rd, to put the bodies in the grave?

"Remember, the State only has to show to you that the defendant killed [T.M.] and [J.M.] on or around November—or September 21st. We're not required to prove the exact time, and that's why we are allowed to put in language on or about. Maybe the murders happened on the afternoon of the 21st, maybe it was the night of the 21st, or maybe they happened on the 22nd. That is still on or around.

"And quite frankly, the defense is chasing a red herring when they are looking at how long the grave was open. It doesn't matter how long the grave was open. What matters is who put the bodies in the grave.

"Could Dr. Tomb have done a better job documenting what he did? Sure. I will give the defense that. But remember, this is a local professor, he's at home, he gets a call. Can you assist the police? Sure. He could have said no, but he goes out there to do what I would consider to be a good thing. He's not a professional forensic scientist. His dad didn't run a laboratory. That's all true.

19

"And Dr. Palenik testified that he thought that time was a critical factor. That the time that the grave had been open was a critical factor. And maybe the defense can explain to you why the time the grave was open is a critical factor. I don't see how that is the case. And I would submit to you that the length of time the grave was open, if it was dug on the 21st and the bodies put in there on the 23rd, or if it was the—if he dug the grave and immediately put the bodies in there, I just don't see how that makes a difference."

The prosecutor did not explicitly reference Dr. Tomb's testimony in discussing premeditation. Aguirre's counsel did, however:

"The reason Dr. Tomb was important is Dr. Tomb got this investigation started on a path, and the reason Dr. Tomb is important is because he's talking about this grave being open for twelve hours before the bodies were put in it. And what's important is it went from twelve hours to later in the investigation when the defendant's been arrested for capital murder, and then it goes to what? Then it goes to 24 hours. And then after that when he did his presentation for you it said several days.

"So what's the implication? Somebody dug this grave, it was open for several days before somebody put the bodies in it? Why are they presenting that evidence? Because it implies to you that somebody dug the grave before the act occurred, because he didn't get back on—til the 21st, based on their evidence, and then supposedly he was over at Miss Brown's house on the 2nd, and I guess their theory is they were being buried, so if it was open for several days, well, then he must have planned all of this. What's that suggest to you? Are they saying that the grave was dug before he drove up to Chicago, he was just gonna leave an open grave in a field right next to his house and drive all of the way to Chicago and back, leave it open four or five days? That doesn't make any sense, but the reason it's important is because we have to respond to it."

20

Aguirre's counsel further proceeded to lambaste Dr. Tomb's "sloppy" logic, lack of qualifications, imprecise methodology, lack of accounting for alternative explanations, and inconsistent conclusions.

*Analysis*

*Gatekeeper role; legal standard*

We begin by assessing whether the district court performed its gatekeeper role and used the correct legal standard for considering Dr. Tomb's expert testimony. While the district court's decision contained no reference to K.S.A. 60-456(b) or *Daubert*, the district court did refer to the pretrial hearing on Aguirre's motion—which, itself, explicitly referenced *Daubert* and K.S.A. 60-456(b)—as "the *Daubert* hearing." The district court also referred to Aguirre's motion as "the *Daubert* motion" shortly before making its ruling. Moreover, while the district court did not explicitly reference the requirements of K.S.A. 60-456(b) or *Daubert* in ruling on Aguirre's motion, the court did broadly speak to Dr. Tomb's qualifications and the reliability of Dr. Tomb's testimony, which the district court found to be based in observation, rather than experiment.

Additionally, the district court's ruling on Aguirre's Motion for More Specific Findings—which again cited K.S.A. 60-456(b) and complained that the district court "did not address the specific findings under the statute"—reiterated the court's view that Dr. Tomb was qualified and that his "specialized knowledge" and method of examining the samples taken from the grave were sufficient to "allow him to express an opinion as to how long [the grave] potentially could have been open." And the district court further noted that, with respect to the amount of time the grave could have been open, "[T]here

21

was a window, and obviously there were many variables that could affect all that, and I think he acknowledged that."

The Tenth Circuit has recognized "that the district court need not 'recite the *Daubert* standard as though it were some magical incantation,' . . . or apply all of the reliability factors suggested in *Daubert* and *Kumho*." *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 [7th Cir. 1998]). But the Tenth Circuit has also held "that a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Goebel*, 215 F.3d at 1088 (reversing district court's ruling when "[t]here is not a single explicit statement on the record to indicate that the district court ever conducted any form of *Daubert* analysis whatsoever"). Moreover, while a *Daubert* hearing is "[t]he most common method for fulfilling" a district court's gatekeeping function, it "is not specifically mandated." 215 F.3d at 1087.

Here, the district court held what it considered to be a *Daubert* hearing and ultimately issued a ruling that both addressed Dr. Tomb's qualifications and broadly opined on the reliability of his opinion and methodology. Thus, we find that the district court performed its gatekeeper function here. Cf. *United States v. Avitia-Guillen*, 680 F.3d 1253, 1260 (10th Cir. 2012) (findings as to expert qualifications, though brief, "adequately demonstrate" district court performed gatekeeping duty).

The question of whether the district court used the correct legal standard gives us more pause. On balance, the district court's statements suggest that it at least attempted to apply the "*Daubert*" standard, and, given the federal courts' practice of requiring neither a talismanic recitation of the *Daubert* factors nor the elements of Federal Rule of Evidence

22

702, which essentially mirrors K.S.A. 2020 Supp. 60-456(b), we find that the district court did not abuse its discretion by using an incorrect legal standard.

Whether the district court correctly *applied* that standard, however, is another question entirely.

*Application*

Having established that Dr. Tomb qualified as an expert using the correct gatekeeper role and legal standard, the next question that must be answered is whether his expert opinions were sufficiently relevant and reliable when applied to the facts of this case. The parties agree that Dr. Tomb expressed two overarching and relevant opinions: (1) the age of the grave; and (2) the amount of time that lapsed between the time the grave was dug and the time the grave was filled. The first opinion is not at issue.

The second opinion has been dubbed the "open grave" opinion. Aguirre argues that, despite Dr. Tomb's botanical experience, he had no experience on which to base a reliable opinion about the length of time during which the grave was open to the sky. The State counters by arguing that Dr. Tomb is well qualified in the field of botany, which was the core scientific theory at the heart of his opinion.

While we note that Dr. Tomb had never rendered an "open grave" opinion before, we believe Aguirre's argument cuts the matter too finely. While Dr. Tomb did not have any experience evaluating graves, he was qualified to identify many aspects of that grave. Aguirre cannot overcome these qualifications by characterizing Dr. Tomb's opinion as solely one of "open grave" analysis, since Dr. Tomb's opinions were based on (1) how many leaves he observed in samples taken from beneath one of the bodies in the grave,

23

(2) his ability to identify box elder leaves and other plant matter, (3) his knowledge of how molds and bacteria break down plant matter, and (4) his knowledge of how box elder trees lose their leaves.

But the district court's assessment of the *reliability* of Dr. Tomb's critical opinion about the lapse of time during which the grave lay open to the sky is another matter. At its core, Dr. Tomb's opinion was: The presence and quantity of box elder leaves found beneath the bodies—leaves which must, by inference, have accumulated only naturally while the grave lay open—suggests that the grave lay open for a defined minimum period of time before the bodies were placed in the grave. In other words, Dr. Tomb's conclusions suggest a plausible—but by no means definitive—explanation for the presence of foreign material (box elder leaves) in an unexpected place (under bodies in a hole in the ground) based on inferences derived from his vague familiarity with imprecise natural "facts" (how quickly box elder trees lose their leaves in the absence of any unforeseen variables).

As applied to the requirements of K.S.A. 2020 Supp. 60-456(b) based on experiential, rather than experimental, reliability, reasonable minds could differ as to whether Dr. Tomb's selection and quantity of samples of leaf-bearing grave soil and his basic familiarity with the abscission patterns of box elder trees constituted sufficient facts or data on which to establish an opinion; the same is true of Dr. Tomb's limited review of the weather information, based on his conclusion that there had been no frost yet. Likewise, we believe that reasonable minds could disagree as to whether Dr. Tomb's analysis of those samples—which showed a cumulus of three to seven layers of box elder leaves—constituted a reliable application of botanical principles and methodology. On these points, the district court did not abuse its discretion.

24

But plausible is not the same as reliable. The problems in this case lie in the unreliable way Dr. Tomb applied his botanical knowledge to the facts at issue presented here. First, Dr. Tomb's opinion assumes no other viable mechanism for the deposit of box elder leaves beneath the bodies beyond simply falling there from the overhead trees during the time in which the grave lay open. He discounted the possibility that already fallen leaves could have infiltrated the grave during that time by other means—careless digging, perhaps, or simply the blowing wind. Second, Dr. Tomb's knowledge of the default rate of box elder tree abscission was incredibly imprecise; he could say nothing more definitive than that such leaf fall did not take place all at once. Third, Dr. Tomb could not account for all the variables that might have affected the default rate of box elder leaf fall—whatever it may be—and his focus on the absence of frost, as the sole determinative weather factor, is overly myopic.

In short, Dr. Tomb took his broad familiarity with plant life and attempted to apply it to a specific subject about which he knew admittedly little, while failing to take into account any variables that might have altered his ultimate conclusion. The resulting opinion cloaked what was essentially a broad inference about the natural world in the veneer of scientific respectability. Consequently, while we believe the district court was correct in permitting Dr. Tomb to testify about the state and amount of the grass and leaves present in the grave, and would have even been correct in permitting Dr. Tomb to testify that box elder trees do not lose their leaves overnight, the district court nevertheless abused its discretion in permitting Dr. Tomb to conclude that, therefore, the graves *must* have been open for any particular length of time before the internment of the bodies. The district court failed in applying its gatekeeping role to the facts of this case by permitting such testimony, which was not the product of reliable principles and methods reliably applied to the facts of the case.

25

*Harmlessness*

We must next determine whether the district court's error was harmless. The State bears the burden of establishing that there was no reasonable probability that the district court's erroneous admission of expert testimony affected the trial, in light of the entire record. *State v. Gaona*, 293 Kan. 930, 940, 270 P.3d 1165 (2012).

Here, the most obvious indication that the district court's error was harmless lies in the verdict ultimately reached by the jury. Critically, Dr. Tomb's opinion, if believed, would have required Aguirre to dig the grave a minimum of 12 hours—and perhaps up to a few days—before the bodies of T.M. and J.M. were interred within it, which would only be consistent with a theory of premeditated murder. Yet the jury convicted Aguirre of voluntary manslaughter in the killing of T.M., indicating that it gave more credence to the thorough refutation of Dr. Tomb's opinion on cross-examination and by Dr. Palenik than to Dr. Tomb's opinion. And while the jury did convict Aguirre of the premeditated murder of J.M., we find that Dr. Tomb's "open grave" opinion added essentially nothing to the circumstantial evidence necessary to support such a finding, as we will discuss more in-depth in addressing Aguirre's fourth issue, which we consider out of order below.

Aguirre also contends that the defense was forced to spend time, resources, and energy rebutting Dr. Tomb's "open grave" opinion. While we acknowledge this hardship, we find it to be too speculative to constitute a reasonable probability that, but for the district court's error, the result would have been different. Indeed, Dr. Tomb's testimony essentially gave Aguirre's counsel ample fodder to highlight what it characterized as the nonsensical nature of the State's theory that Aguirre dug the grave in a field close to his residence, drove to Chicago, drove back to Ogden, killed T.M. and J.M., and *then* interred the bodies. Consequently, we find the district court's error to be harmless.

26

*Sufficiency of the evidence to support a finding that J.M. was killed with premeditation*

Aguirre also challenges the sufficiency of the evidence supporting his conviction for the premeditated murder of J.M., claiming such a conviction was only possible through impermissible inference stacking. In evaluating the sufficiency of the evidence, we must again assess the impact of the district court's erroneous admission of Dr. Tomb's "open grave" testimony on the jury's ultimate verdict.

*Standard of Review*

"When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. This court has also recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. 'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.' [Citations omitted.]" *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016).

*Discussion*

By its very nature, premeditation "is most often proved by circumstantial evidence." *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017). We have previously recognized several factors that, if present, could support an inference of premeditation, including: "(1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) any threats or declarations of the

27

defendant before or during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *State v. Lloyd*, 299 Kan. 620, 633, 325 P.3d 1122 (2014). But a conviction cannot be sustained by "a presumption based upon other presumptions," i.e., by inference stacking. *Banks*, 306 Kan. at 859. On the other hand, "it is permissible for the State to rely on multiple circumstances to support an inference of premeditation, so long as each circumstance has been proved, rather than presumed from another circumstance." 306 Kan. at 860-61.

Aguirre highlights the testimony of his fiancée at the time of the investigation, Dulce Mendez, as the only evidence directly speaking to the death of J.M.:  "[Aguirre] said that he—he had put the little boy [J.M.] to sleep and he had maybe wrapped him too tightly, and he had a pacifier in his mouth and perhaps he stopped breathing." Aguirre also attempts to undermine the limited forensic evidence—specifically, the evidence of internal bruising which may or may not have been related to J.M.'s death—as insufficient to support an inference of intentional conduct.

Aguirre's assessment that there was no "evidence that J.M. was even killed" appears to differ from Dr. Erik Mitchell's testimony, however. While Dr. Mitchell could not determine from his autopsy a specific *mechanism* of death for J.M.—despite his observation of an "indication of some application of force to the chest"—Dr. Mitchell opined that the *manner* of death was homicide. Between this and the evidence of "some pressure artifact or traumatic artifact" on J.M.'s chest, we believe there was ample evidence to support a finding that J.M. *was* killed in a homicide.

Separately, Mendez' testimony supports an inference that Aguirre was involved in J.M.'s killing, despite his claim that it was an accident. Also, from J.M.'s young age— which almost inevitably implies both that J.M. was helpless and that he did not provoke

28

such a killing—and the apparently close-in-time killing of his mother, a jury could also fairly infer that the killing was premeditated. Thus, we believe that, when viewed in a light most favorable to the State, separate evidentiary components support the findings that: (1) J.M. was killed (Dr. Mitchell's forensic testimony), (2) that Aguirre killed him (Mendez' testimony), (3) the inference that the act of killing J.M. was not only non-accidental, but premeditated (J.M.'s young age and inability to provoke a killing, a secretive and remote burial, along with the apparently close-in-time killing of T.M.).

Additionally, email evidence—discussed more thoroughly below—and evidence from the shelter where T.M. and J.M. were staying immediately prior to their deaths implicates Aguirre in their deaths by providing additional clues as to identity and, potentially, a motive. The State also highlights the post-killing emails sent by Aguirre to T.M.'s account on September 26 and October 10 and T.M.'s representation to her case worker "that she was moving to Texas with [J.M.'s] father"—despite Aguirre's residence in Kansas—as additional evidence in support of Aguirre's involvement and in support of the premeditated nature of his conduct.

Aguirre attempts to distinguish the killing of J.M. from the situation present in *Lloyd* by pointing out that, in *Lloyd*, a witness actually saw the defendant strangle the child victim. But the *Lloyd* court noted that strangulation was *independently* sufficient to establish an intentional, premeditated killing based on the "time for deliberation" needed to complete such a killing. 299 Kan. at 634. As the *Lloyd* court went on to write, the child's age (17 months) and inability to provoke the defendant both suggested premeditated conduct, as did Lloyd's post-killing conduct. 299 Kan. at 635.

Aguirre has additionally made the compelling argument that the district court's erroneous admission of Dr. Tomb's "open grave" testimony was not harmless because it

could have been used by the jury to infer premeditated conduct in the killing of J.M. But we believe that the unique circumstances of this case militate against the finding that, but for this error, the result would have been different. Specifically, Aguirre's theory asks the court to assume that the jury simultaneously disbelieved Dr. Tomb's testimony with respect to the killing of T.M. but found it credible with respect to the killing of J.M. We can conceive of no plausible factual scenario that would be consistent with such a premise, however. If the jury believed that Aguirre killed T.M. in an act of voluntary manslaughter, and also killed J.M. close enough in time to T.M. to warrant burial in the same shallow grave, it defies belief to assume that Aguirre would kill T.M., dig a hole large enough for both T.M. and J.M., *then* return to kill J.M., *then* bury both bodies more than 12 hours after initially digging the hole.

More fundamentally, the "open grave" testimony added nothing to the facts beyond what was already sufficient to support an inference of premeditation with respect to J.M.'s killing. As in *Lloyd*, J.M.'s young age, helplessness, and inability to provoke violence independently support an inference of premeditation. See 299 Kan. at 635. And, as we have noted, the fact that T.M. was killed close enough in time to J.M. so as to warrant burial in the same grave strongly suggests that J.M. was not killed accidentally or recklessly. And while we recognize the plausibility of an intentional-but-not-premeditated killing of an infant or toddler, we do not think that a thoroughly rebutted "open grave" opinion could conceivably have moved the jury's deliberative needle on this aspect one iota, under the circumstances.

Consequently, we find that sufficient evidence existed to support Aguirre's conviction for the premeditated killing of J.M. without the need for the jury to stack inferences.

30

*The parties' stipulation as to the authenticity of Aguirre's emails*

Aguirre also challenges the district court's decision to find that the parties' stipulation to the emails' authenticity at the first trial was also enforceable at the second trial.

*Standard of Review*

The parties begin by disputing the applicable standard of review. Aguirre concedes that the Court of Appeals applied an abuse of discretion standard on a similar issue in *State v. Schroeder*, No. 90,828, 2004 WL 1878348, at *3 (Kan. App. 2004) (unpublished opinion), but nevertheless argues that this issue involves interpretation of a written document and should be reviewed de novo. The State, meanwhile, points to *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1098 (10th Cir. 1991), which held that federal district courts "are vested with broad discretion in determining whether to hold a party to a stipulation or whether the interests of justice require that the stipulation be set aside."

"[W]hether the consent or admission or waiver is to be considered as made for the purposes of that trial only, or as a general admission, is ordinarily a question of fact," but a written instrument—such as an agreed statement of facts—"may be so obviously intended for that trial alone that the court may properly so instruct the jury, and it may also be so obviously intended as a general admission that the court may instruct the jury to treat it as such." *Central Branch Union Pac. R. Co. v. Shoup*, 28 Kan. 394, 397 (1882). Under federal law:

> "Stipulations 'cannot be disregarded or set aside at will.' Stipulations, however, are not absolute and will be set aside to prevent manifest injustice. The district court has

31

broad discretion to determine whether a party should be held to a stipulation or whether justice requires the stipulation be set aside. Whether a stipulation made in the first trial should remain binding during the retrial is determined by 'the nature of the stipulation and the circumstances underlying its formulation.' Formal stipulations made for the purpose of relieving a party from proving facts can generally be substituted as proof of the stipulated fact in a subsequent trial of the same action. Where, however, 'a stipulation is limited expressly to a single trial and phrased in terms of conclusory, rather than evidentiary, facts, district courts may on retrial free a party from the stipulation.' [Citations omitted.]" *Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1075 (10th Cir. 2008).

See *United States v. Lentz*, 419 F. Supp. 2d 843, 845 (E.D. Va. 2006).

We will, therefore, evaluate a district court's decision regarding the enforceability of a previous trial's evidentiary stipulation at a second trial, or retrial, for abuse of discretion. In so doing, we are mindful of the potential for a district court to commit an error of law in the interpretation of a written document. See *State v. Miles*, 300 Kan. 1065, 1066, 337 P.3d 1291 (2014) (district court may abuse discretion by committing an error of law, *inter alia*); *State v. White*, 289 Kan. 279, 286, 211 P.3d 805 (2009) (written plea agreements reviewed de novo). Additionally, given the dearth of state law on the matter, we find the above-noted federal guidance persuasive in analyzing this somewhat unusual issue.

*Additional Facts*

Prior to the first trial, the parties filed a joint stipulation with the district court, which provided, in part:

32

"WHEREUPON the parties announce to the Court that the following stipulation has been reached concerning certain evidentiary matters involved in the jury trial of the above-referenced case and that, if requested by either party, this stipulation may be read, in whole or in part, by the Court during the presentation of the State's evidence."

Under the stipulation, the parties agreed "[t]hat the emails contained on the CD Bate Stamped #003656 are true copies of emails of the defendant Luis Aguirre under the profile member name(s): liukang8735@yahoo.com maintained by Yahoo! Inc." The parties further agreed

"[t]hat the State has substantially complied with the requirements of K.S.A. 60-245a and the defendant waives any objection to the admission of the emails contained on CD Bate Stamped #003656 based on non-compliance with K.S.A. 60-245a. The defendant does not waive objections to the admission of the emails on other grounds."

According to the affidavit of Aguirre's first trial counsel, Jeffrey Wicks, the potential for the death penalty "was the controlling factor in how the case was handled." But Wicks represented that "foundation of the E-mails was not an issue we were concerned with" and that the stipulation was made following "a request . . . by the State that we stipulate to the foundation of the E-mails." Additionally, Wicks averred that "counsel was not contemplating any retrial" at the time of the stipulation.

The stipulation covered roughly 150 emails that consisted of communications between T.M. and Aguirre from January 16, 2009, to October 10, 2009. Broadly summarized, the emails document T.M.'s attempts to see Aguirre and to obtain support from him for J.M.; Aguirre generally responded with a variety of excuses, equivocations, and vague expressions of hope for a relationship in the future. By August of 2009, T.M.'s patience with Aguirre appears to have run out, culminating with a vitriolic email in which

33

T.M. wished Aguirre dead after she and J.M. were forced to sleep on a porch. In her penultimate email of September 1, 2009, T.M. told Aguirre that, because she did not want to stay at the shelter any longer, Aguirre should "let me know by the 20th of sept what you want to do if nothing going to happen by then im not waiting nomore!!!" T.M. sent Aguirre a final email on September 16, 2009, blaming Aguirre for her state of affairs and noting that J.M. was sick once again.

Subsequently, on September 26—days after the probable date on which T.M. and J.M. died—Aguirre wrote an email back that suggested T.M. was moving to California and planning to give J.M. up for adoption to "your sis or cousin or who ever it was" and asking her to reply with her "decision." Then, on October 10, Aguirre wrote:

> "[S]o now you dont want to answer me????? i asked you a question [T.M.]! by the way i wrote to julius and i will get to the bottom of things so you better start explaining and talkin to me if we are trying to work something out. i will get answers from ur aunt."

Following *Aguirre I*, Aguirre filed a motion in limine with respect to the emails, asking the district court for an order requiring the State to prove compliance with K.S.A. 60-245a before admitting "any evidence at trial obtained by business record subpoenas." In response, the State argued that the stipulation filed June 22, 2012, remained binding. The State also argued that it acted in reliance on the stipulation and would be disadvantaged if it was not enforced because, according to Yahoo! legal compliance, copies of the emails "no longer exist"; apparently, Yahoo! only maintains such records for three years.

In response, Aguirre argued that the stipulation was focused on "'the' jury trial in question and not 'any' jury trial." Aguirre focused on the plain language of the stipulation,

34

but argued, as a fallback, that if the phrase "the trial" was ambiguous, the language must be construed against the State, either as the drafter of the stipulation or by virtue of the notion that ambiguous documents are always construed against the State.

The district court rejected Aguirre's argument, as follows:

"The trial. I guess that's our argument on this motion. On its face the stipulation does not place any limitations on the stipulation aside from the fact that it says 'the trial'. This is the same trial. We have the same defendant, the same alleged victim, the same— the only difference here is the State has chosen not to proceed with a request for capital punishment. Other than that, it's the same trial. And for that reason, and the fact that I do not believe that the stipulation places any limits on it, I don't believe that wording places any limits on its use; and further, the State in reliance upon that, and they had—I believe had a right to rely upon that stipulation, would be prejudiced by not being able to obtain the necessary affidavits required on business subpoenas.

"Therefore, my finding will be that the stipulation is binding upon this retrial."

The State ultimately presented the emails at the second trial.

*Discussion*

Aguirre frames the matter as one of simple document interpretation under the principles of contract construction, arguing the stipulation plainly refers only to Aguirre's prior trial. As fallback, Aguirre claims that, to the extent the stipulation is ambiguous, it should be construed against the State. The State, in response, cites federal and out-of-state caselaw suggesting that any attempt to limit a stipulation to one trial only must be expressly stated in the stipulation itself.

35

Aguirre's first argument, predicated on the stipulation's use of the definite article "the," referencing "certain evidentiary matters involved in *the* jury trial," is not persuasive. First of all, a majority of this court has found "the" to be ambiguous in the context of a reference to "'*the* acts that this section prohibits.'" *State v. Gensler*, 308 Kan. 674, 680, 423 P.3d 488 (2018); see *State v. Baker*, 56 Kan. App. 2d 335, 340, 429 P.3d 240 (2018), *rev. denied* 308 Kan. 1596 (2018). But see *Gensler*, 308 Kan. at 686 (Stegall, J., dissenting) ("I suggest that if we can discern an ambiguity in the definite article 'the,' we can discern an ambiguity in virtually any language the Legislature may choose."). More importantly, the stipulation did not purport to apply to "*the* jury trial" or "*this* jury trial." Rather, it applied to "*certain evidentiary matters* involved in the jury trial of the above-referenced case." (Emphasis added.) Those matters were involved in both trials. Regardless, the phrasing in the stipulation at issue does not clearly indicate the scope of the stipulation one way or the other: it could very well mean "this" and only "this" jury trial, but it could also refer basically to the concept *of* a jury trial that involves "certain evidentiary matters" in "the above-referenced case." Thus, the stipulation appears ambiguous insofar as whether it applies only for the first trial or also for any trial in this case.

Aguirre's fallback argument—that any ambiguity should be construed against the State—is at odds with the "general rule" elsewhere:

> "[W]here a stipulation is distinctly and formally made for the express purpose of relieving the opposing party from proving some fact or facts, or where a formal admission of facts is made by counsel and becomes a part of the record, such a stipulation or admission, *provided it is not by its terms limited to a particular occasion*, or a temporary object, can be introduced in evidence and is available as proof of the facts admitted upon a subsequent trial of the same action, unless the court permits its withdrawal upon proper application therefor." (Emphasis added.) 100 A.L.R. 775.

Thus, stipulations are generally binding during subsequent trials (or retrials) unless expressly limited by their own terms. E.g., *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998); *State v. Jones*, 549 S.W.2d 925, 926-27 (Mo. App. 1977). See also *United States v. Burkhead*, 646 F.2d 1283, 1285 (8th Cir. 1981) ("The stipulation concerning the introduction of certain exhibits was not by its terms limited to use in the first trial and the record indicates that the intention of the parties was to the contrary."). This rule holds true even in the case of a written stipulation. See *Wheeler*, 935 F.2d at 1099 (noting the "tactical" nature of the objection to the stipulation); cf. *State v. Gordon*, 219 Kan. 643, 651, 549 P.2d 886 (1976) ("By its express terms, the stipulation is a limited one."). We find Aguirre's cited authorities to the contrary—which do not involve stipulations of fact—to be readily distinguishable. See *United States v. Lutz*, 420 F.2d 414, 416 (3d Cir. 1970) (jury trial waiver in first trial held not binding on retrial after mistrial); *United States v. Mischlich*, 310 F. Supp. 669, 672 (D. N.J. 1970) (following reversal on appeal, "parties are returned to their original positions and, at the new trial, can introduce new evidence and assert new defenses not raised at the first trial").

The phrase "involved in the jury trial of the above-referenced case" does not expressly limit the stipulation to the *first* jury trial. Given the subject matter following "the"—"jury trial of the above-referenced case"—it would appear unusual, given the nature of the stipulation, to substitute a word like "any" in place of "the" to more clearly expand the scope of the stipulation. The affidavit of Aguirre's trial counsel, showing that "counsel was not contemplating any retrial" at the time of the stipulation, underscores this latent absurdity. It seems completely logical that trial counsel would assume the trial to be the final action in district court, short of posttrial motions and a notice of appeal. Retrials are rare enough that trial counsel did not even consider that possibility when agreeing to the stipulation. Additionally, given the significant harm the State would suffer by virtue of its reliance on the stipulation and the unfortunate circumstances beyond its

37

control—i.e., Yahoo!'s email retention policy—we believe the ends of justice require that the stipulation be binding at the second trial. Consequently, we find no abuse of discretion in the district court's decision.

*The district court's denial of Aguirre's requested jury instruction on inference stacking*

Aguirre next challenges the district court's refusal to issue a requested cautionary jury instruction against inference stacking.

*Standard of Review*

When presented with a claim that a district court has committed an error by refusing to issue a jury instruction,

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

Because Aguirre's trial counsel requested an instruction prohibiting the jury from inference stacking, the harmlessness standard set forth in *Ward*—rather than clear error—applies. *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015). Aguirre claims that the requested jury instruction "went to the State's burden of proof," mandating the

application of the constitutional harmlessness test rather than the lower statutory harmlessness test; the State provides no alternative. Consequently, we assume, without deciding, that any error here is only harmless if the State "proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, 542, Syl. ¶ 6, 256 P.3d 801 (2011).

*Discussion*

As noted, Aguirre's counsel requested a jury instruction cautioning the jury against inference stacking, which the district court denied. Specifically, the proposed instruction read: "[Y]ou may not find an element of a crime from an inference that is based solely upon an inference. However, you may draw reasonable inferences from facts established in the evidence." Consequently, the matter was preserved for our review.

Aguirre drew the proposed instruction from *State v. Dreiling*, 274 Kan. 518, 542, 54 P.3d 475 (2002), which modified slightly the holding in *State v. Gobin*, 216 Kan. 278, 531 P.2d 16 (1975). In *Gobin*, the court ruled: "Presumptions and inferences may be drawn only from facts established." 216 Kan. at 284. The State claims the jury could have been misled from the proposed instruction to believe that the rule only applied to facts necessary to establish elements of a crime rather than to all facts.

We find the State's claim that the requested instruction misstates the court's holding in *Gobin* to be splitting hairs. Although Aguirre's proposed instruction only directly proscribes the jury's finding an *element* via inference stacking, it cannot fairly be

39

read to somehow sanction a jury's determination of non-element facts based on inferences derived from other inferences. Thus, the requested instruction was legally appropriate.

But we are not convinced that this instruction was factually appropriate because, at its core, we find Aguirre's argument on this point to be entirely speculative. In any trial involving circumstantial evidence, there will almost certainly be at least some background risk of impermissible inference stacking by jurors, and since a jury cannot be interrogated directly about how it reached its decisions, inference stacking could always theoretically be implicated. As we discussed above, the jury here was not *required* to stack any inferences upon other inferences in order to find that J.M.'s killing was premeditated. Aguirre's statement to Mendez directly implicated him in the deaths of both T.M. and J.M.; from there, separate facts support an inference of premeditation as to J.M.'s killing. J.M.'s young age, his inability to provoke or fight back, his close-in-time death to T.M., and his secretive and remote burial all separately suggest a premeditated killing, regardless of the absence of a proven mechanism of his death. This conclusion is further buttressed by the fact that the jury clearly did not believe that T.M.'s killing was premeditated, which suggests that the jury only considered single-step inferences from Aguirre's alleged admissions of involvement and the other facts of the case in determining his ultimate culpability.

Consequently, because there does not actually appear to have been a real danger that the jury stacked inferences in order to reach its conclusion, we do not believe Aguirre's requested instruction was factually appropriate. While the factual record must be evaluated in a light most favorable to Aguirre on this point, pure speculation cannot backfill an evidentiary absence to render a speculative, cautionary jury instruction factually appropriate. To conclude otherwise would essentially mandate a similar instruction in all cases involving circumstantial evidence; this, we believe, goes too far.

*Prosecutorial error in the prosecutor's closing argument*

Aguirre next argues that the prosecutor committed prosecutorial error by misstating the requirement of jury unanimity and diluting the burden of proof.

*Standard of Review*

A claim of prosecutorial error generally does not require a contemporaneous objection in order to be preserved for appellate review, "'although the presence or absence of an objection may figure into our analysis of the alleged misconduct.'" *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017) (quoting *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]). This court reviews a claim of prosecutorial error under a two-step analysis:

> "[T]he appellate court must decide whether the prosecutorial acts complained of fall
> outside the wide latitude afforded prosecutors to conduct the State's case and attempt to
> obtain a conviction in a manner that does not offend the defendant's constitutional right to
> a fair trial. If error is found, the appellate court must next determine whether the error
> prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we
> simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*.
> In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a
> reasonable doubt that the error complained of will not or did not affect the outcome of the
> trial in light of the entire record, i.e., where there is no reasonable possibility that the
> error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060
> (2016).

In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made,

rather than analyzing the statement in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018).

*Additional Facts*

The prosecutor began closing arguments by telling the jury:

"Shortly you're going to go back to the jury room to deliberate on a verdict. And some of you have been on juries before; others have not. And I would anticipate that in this case there's a certain amount of anxiety with all of you about the job that you have to do.

"And many years ago I heard a lawyer explain that a verdict is simply the law plus credible facts. And I like this equation because I think it helps you understand exactly what it is that you're supposed to do, and how you go about doing it."

The prosecutor went on to detail the elements of the capital murder charge and the lesser included offenses, noting the State's burden of proving those elements. After the prosecutor finished discussing the jury's obligation to follow the jury instructions, he told the jury:

"I like this equation because it tells you that not only is it the law, but it's law plus credible facts. And the facts of this case are what was presented at trial. The testimony of witnesses, the e-mails, the defendant's statement both to the police and to others.

"But who determines credibility? I mean, the attorneys have been running this all week with lots of stops and starts, and the judge has been giving you law. You have only been listening.

"The instructions tell you it's for you to determine what is credible. That's your job. That's why we have people from the community to come in. What facts can you give weight and credit to, and what evidence do you hear that carries little or no weight?"

After summarizing the circumstantial evidence supporting the State's case for a finding of premeditation, the prosecutor concluded with this:

"I'm confident the defense will argue that the State is just guessing. That we are making one inference and jumping to conclusions. That because Dr. Mitchell can't point to exactly how [T.M.] and [J.M.] died, and because we didn't present one person who was an eye witness to the murder to testify to exactly what happened, that the State has failed to meet its burden of proof. I'm confident that that argument will be made.

"But there is an old story that is used by trial attorneys about a group of blind men who come upon an elephant, and each man touches the elephant to try to determine what it is. One man feels the elephant's ears and says, you know, an elephant is like a plant. It's thin and floppy. Another man feels the elephant's trunk and says no, I think an elephant is like a snake. It's long. And another man touches the side of the elephant, it's wide and it's tall, and he says an elephant is like a wall. And then the men walk away, and they never put their heads together to determine what an elephant is like.

"Shortly the 12 of you are going to go back to the jury room. I ask that you put your heads together and really examine this case. Use your common knowledge and experiences. Take the law that Judge Wilson has given you and add to it the credible facts. When you do that, there is only one verdict that can be reached in this case, and that is the verdict of guilty of capital murder. It's a verdict that the evidence demands and justice requires, and that's the verdict the State is asking that you bring back. Thank you."

43

*Discussion*

Aguirre first attacks the prosecutor's statement that "'a verdict is simply the law plus credible facts.'" He alleges two sub-errors with this formulation:  First, he claims that the term "verdict"—without the qualifier "guilty"—misled the jury into believing that "the only verdict they could return was guilty"; and, second, he claims that the focus on "credible facts" "left out the critical connection between the facts and law, lowering the State's burden of proof."

We find neither argument persuasive. While we agree that "[a]ny attempt to lower the burden of proof—or even to define reasonable doubt—is misconduct," this principle does not apply to the prosecutor's actual comments, if read fairly in the context of the entire closing argument. *State v. Holt*, 300 Kan. 985, 1004, 336 P.3d 312 (2014). As to Aguirre's first claim, the context surrounding the prosecutor's commentary makes it abundantly clear that he was speaking about a "guilty" verdict; the prosecutor's argument makes no sense otherwise. Had the prosecutor simply left the jury with the basic formula complained of here without explanation, Aguirre might have a point. As it is, however, it is difficult to surmise how any reasonable juror could have understood the prosecutor's arguments to suggest either that the jury could not return a not guilty verdict unless it was supported by credible facts or that they could *only* return a guilty verdict. Likewise, Aguirre's second claim ignores the prosecutor's emphasis on establishing the elements of both capital murder and the various lesser included offenses, which the prosecutor attempted to tie into the facts.

Aguirre also challenges the prosecutor's allegory about the three blind men who attempt to describe an elephant. As Aguirre reads the prosecutor's argument, the prosecutor allowed the jury to ignore its obligation to reach unanimous agreement as to

44

every element of the crime beyond a reasonable doubt by implying that they could reach a guilty verdict "if one juror believed there was only evidence of one element and a second juror believed there was only evidence of a different element."

Again, our reading of the prosecutor's argument does not reveal error. In the prosecutor's story, the three blind men err by never coming together and reaching a consensus—based on the individual opinions of each blind man—about the true shape of an elephant. It is difficult to view the prosecutor's urging of the jury to "put your heads together and really examine this case" and to "[u]se your common knowledge and experiences" as a suggestion that the jurors need not reach a unanimous consensus before coming to a verdict. While the prosecutor's story may have suggested that each juror might have had a different view of the facts—"what an elephant is like"—*before* engaging in deliberations, it cannot reasonably be inferred from this story that the jury could reach a verdict based solely on the discordant, idiosyncratic views of the jurors in the absence of a common consensus about the shape of the elephant overall. See Zlotnick, *The Buddha's Parable and Legal Rhetoric*, 58 Wash. & Lee L. Rev. 957, 958-59 (2001) (discussing the "Westernized versions" of the elephant parable where "the blind men are able to figure out that an elephant actually has all these qualities"; "Thus, the moral of the modern version, whether implicit or stated outright, is obvious: 'To find out the whole truth, [one] must put all the parts together.'"). Consequently, we find no error in the prosecutor's closing arguments.

*The district court's jurisdiction to convict Aguirre of both voluntary manslaughter and first-degree murder as lesser included offenses of a single count of capital murder*

Aguirre next argues that the district court lacked jurisdiction to convict Aguirre of two lesser included offenses when he was only charged with one offense—capital murder.

*Standard of Review*

"The question of whether subject matter jurisdiction exists is one of law subject to unlimited review on appeal." *State v. Dunn*, 304 Kan. 773, 784, 375 P.3d 332 (2016).

*Discussion*

Aguirre's argument invokes the plain language of K.S.A. 2020 Supp. 21-5109(b), which provides, in relevant part, "Upon prosecution for a crime, the defendant may be convicted of either the crime charged or *a* lesser included crime, but not both." (Emphasis added.) Aguirre further bases his argument on the premise that "'if a crime is not specifically stated in the information or is not a lesser included offense of the crime charged, the district court lacks jurisdiction to convict a defendant of the crime, regardless of the evidence presented.'" *State v. Johnson*, 283 Kan. 649, 652, 156 P.3d 596 (2007).

In criminal cases, the Kansas Constitution—not charging documents—confers subject matter jurisdiction on a district court. *Dunn*, 304 Kan. at 811. Instead, "A Kansas charging document should be regarded as sufficient now . . . when it has alleged facts that would establish the defendant's commission of a crime recognized in Kansas." 304 Kan.

46

at 811-12. This is the case here, where Aguirre was charged with one count of capital murder based on two killings.

Additionally, as Aguirre candidly admits, this issue was already decided in *State v. Martis*, 277 Kan. 267, 276-79, 83 P.3d 1216 (2004)—although he claims *Martis* was wrongly decided. *Martis* was charged with one count of capital murder under K.S.A. 21-3439(a)(6), but, like Aguirre, he was convicted of two lesser included offenses. And like Aguirre, *Martis* argued that under K.S.A. 2002 Supp. 21-3107(2)—which, in relevant part, was identical to the portion of K.S.A. 2020 Supp. 21-5109(b) relied on by Aguirre—"a defendant may only be convicted of the crime charged or one lesser degree of that crime." 277 Kan. at 277. The court rejected this argument:

> "The amended information in this case put the defendant on notice that he was alleged to have killed two people with premeditation and the penalty could be as severe as death. Neither K.S.A. 2002 Supp. 22-3201(e) nor K.S.A. 2002 Supp. 21-3107 limit lesser included offenses to consisting of only one count. Under this particular subsection of the capital-murder statute, the lesser included offenses necessarily include two or more separate counts of first-degree murder." 277 Kan. at 279.

We think *Martis* was correctly decided, and we do not depart from it here. Contrary to Aguirre's argument, we do not read the plain language of K.S.A. 2020 Supp. 21-5109(b) to otherwise suggest that "a" refers to "a [*single*] lesser included crime"; that subsection plainly only prevents a defendant from being convicted of both a charged crime and a lesser included crime and, thus, effectively being doubly penalized. See *Trotter v. State*, 288 Kan. 112, 124, 200 P.3d 1236 (2009) (applying *Martis* to find premeditated murder conviction multiplicitous with capital murder conviction based on the killing of more than one individual). By forcing "a" to carry a meaning outside the scope of the plain purpose of K.S.A. 2020 Supp. 21-5109(b), Aguirre commits "the

47

proscribed practice of isolating a statutory provision out of context." *Fernandez v. McDonald's*, 296 Kan. 472, 479, 292 P.3d 311 (2013). Thus, the clear and unambiguous language of K.S.A. 2020 Supp. 21-5109(b) does not support Aguirre's construction. We detect no jurisdictional infirmities in Aguirre's convictions for two separate killings that had been charged together as one count of capital murder.

*Cumulative error*

Finally, Aguirre raises a claim of cumulative error. However, we have only found one error in the district court's decision to admit Dr. Tomb's "open grave" testimony. A single error, by definition, cannot support a finding of cumulative error. *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014). Consequently, we reject Aguirre's claim of cumulative error.

CONCLUSION

Aguirre's convictions for premeditated first-degree murder and voluntary manslaughter are affirmed.

BEIER, J., not participating.
MICHAEL E. WARD, Senior Judge, assigned. [1]

_____

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 119,529 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.

* * *

LUCKERT, C.J., concurring in part and dissenting in part: I disagree with the majority's holding that Luis Antonio Aguirre voluntarily gave his first statement to law enforcement. Many of the same considerations that led to the holding of a *Miranda* violation in *State v. Aguirre*, 301 Kan. 950, 349 P.3d 1245 (2015) (*Aguirre I*), cause me to reach this conclusion. But I concur in the majority's holding that the second statement was voluntary and admissible. That statement—or at least the reasonable inferences a reasonable juror could draw from it—overlapped in many ways with the first statement. This overlap leads me to conclude that Aguirre suffered no prejudice from any error arising from the trial court's decision to allow the State to admit Aguirre's first statement for impeachment purposes.

Like the majority, I begin with the State's argument about Aguirre's failure to preserve this claim of error. The State's preservation argument relies on K.S.A. 60-405, which prohibits us from reversing Aguirre's conviction because "of the erroneous exclusion of evidence" unless he made known to the trial court the "substance of the evidence." The State's argument misses the mark because Aguirre does not object to the *exclusion* of evidence. Instead, he argues the trial court erred by ruling that the State could *admit* his statements to rebut certain evidence if Aguirre opened the door to that evidence. So, like the majority, I reach the merits of Aguirre's argument.

The majority correctly sets out the totality of the circumstances test for assessing the voluntariness of Aguirre's statements. Slip op. at 6 (quoting *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 [2010], and listing the following relevant circumstances: "'[1] the accused's mental condition; [2] the manner and duration of the interrogation; [3] the ability of the accused to communicate on request with the outside world; [4] the accused's

49

age, intellect, and background; [5] the fairness of the officers in conducting the interrogation; and [6] the accused's fluency with the English language.'"). I agree that most of the circumstances of Aguirre's encounter with law enforcement weigh toward concluding Aguirre made his statements voluntarily. But as the majority also set out, one factor standing alone can reveal the statement was involuntary. *State v. Guein*, 309 Kan. 1245, 1259-60, 444 P.3d 340 (2019).

Here, the factor of the fairness of the officers weighs heavily toward determining Aguirre's first statement was involuntary. So heavily, in fact, that I dissent from the conclusion drawn from those circumstances by the majority. Although our first opinion in *Aguirre I* declined to rule on the voluntariness of Aguirre's confession, the majority in that appeal, which I joined, implied it would have concluded the confession—at least the first one—was involuntary if the analysis progressed to that point. See 301 Kan. at 960-61, 963. Here, I close that circle and conclude that Aguirre did not voluntarily provide his first statement.

*Aguirre I* discussed several facts that suggest the detectives' conduct created a coercive environment. The interrogation began under the pretense the detectives were trying to locate T.M. Detectives refuted Aguirre's answers to their questions, intensifying questioning as the interview progressed. Detectives became especially aggressive after confronting Aguirre with the fact of T.M.'s death. They told Aguirre they knew he was lying and that lying made him look worse than telling the truth. They suggested T.M.'s death could have been accidental, that knowing what happened bothered Aguirre, and it was time for Aguirre "to let it off his shoulders." Aguirre expressed concern for his fiancée's son, who had accompanied Aguirre to the interview and whose cries could be heard inside the interrogation room. Aguirre requested to end the interview by indicating he wanted to assert his rights. Even though his assertion of "my rights" echoed the

language of the *Miranda* Advice of Rights form the detectives had read to Aguirre, they continued to badger him to answer questions. *Aguirre I*, 301 Kan. at 955-58.

The majority attempts to distinguish this case from *State v. Swindler*, 296 Kan. 670, 294 P.2d 308 (2013). See slip op. at 8-9. I am not persuaded by the majority's rationale, at least not as to Aguirre's first interrogation. The circumstances surrounding Jeffrey Swindler's and Aguirre's statements are more alike than different.

Aguirre, unlike Swindler, walked into the police station misunderstanding the nature of the police questioning that would follow. Swindler, who officers had earlier questioned, had some insight into why he was going to the Kansas Bureau of Investigation to take a polygraph examination. Aguirre and Swindler each arrived at the police station on his own accord accompanied by a child or children. See *Aguirre I*, 301 Kan. at 955; *Swindler*, 296 Kan. at 672. In both interviews, at some point the tone changed to become more direct and accusatory. See *Aguirre I*, 301 Kan. at 955-56; *Swindler*, 296 Kan. at 673. Both Aguirre and Swindler expressed concern for the children in their care. See *Aguirre I*, 301 Kan. at 955; *Swindler*, 296 Kan. at 673-74. I conclude these circumstances alone are not enough to say the interview in either case was involuntary. But they set a tone that adds to what happened after Aguirre and Swindler attempted to end the interviews and officers continued a badgering and accusatory interview. In each case, the officers' persistence in asking questions even after the accused asserted his right to remain silent weighs heavily in the assessment of voluntariness. See *Aguirre I*, 301 Kan. at 960-61; see also *Swindler*, 296 Kan. at 679-81 (statement involuntary when officers persisted in interviewing Swindler after Swindler attempted to end the interview as officers had represented he could).

51

The majority points to Aguirre's statements that he would return after taking the child home as a factor distinguishing this appeal from Swindler's. The majority draws from Aguirre's offer to return that he voluntarily confessed. Slip op. at 8-9. The transcript reveals Aguirre using the child, whose cries could be heard in the interview room, as a bargaining chip for terminating the interview. We have no finding about whether he really intended to return after delivering the child or instead was latching on to a ready excuse in a futile effort to end the interview and flee. No matter why he asserted his rights, detectives should have honored his right to remain silent.

Instead, after Aguirre said, "I'm going to take my rights," one of the interviewing detectives immediately responded by telling Aguirre he didn't think Aguirre could leave and a judge had issued warrants allowing them to search Aguirre's vehicle, trailer, and body for DNA. The detective told Aguirre things looked bad. The second detective chimed in, encouraging Aguirre to explain what happened and ended by saying, "But you got to be willing to talk to us and explain to us what happened."

In essence, the detectives offered Aguirre his right to be silent but then yanked it away from him. They refused to honor his request and in almost the same breath as telling him he had to remain in custody and to succumb to a search for DNA while his property was being searched, they left the impression he had to talk to them. Granted the "you got to be willing to talk to us" statement was in the context of suggesting Aguirre could help himself by helping the detectives. But the detectives' combined actions of refusing to honor Aguirre's invocation of rights and revealing he could not leave and a court had ordered a search of his body and property would make an ordinary person believe a statement of "you got to be willing to talk to us" meant he had no choice but to answer questions.

52

In summary, the detectives misled Aguirre, badgered him, ignored his invocation of rights, reinitiated questioning, told him the court had ordered a search, and said "you got to be willing to talk to us." These facts create a totality of circumstances that cause me to conclude Aguirre involuntarily made statements to the detectives during his first interview on October 30, 2009.

The same is not true of statements resulting from the interrogation held on November 3, 2009, however. Aguirre relies on *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005), to support his argument that his second interrogation was involuntary. But *Swanigan* is distinguishable.

In *Swanigan*, we identified factors a court should consider when evaluating whether a coerced first interrogation taints any subsequent interrogation. These factors include a change in the location of the interrogation, a change in the identity of the interrogators, the passage of time between statements and any prior coercion, the presence of any other intervening circumstances that attenuate and dissipate the coercive effect of any misconduct, and the purpose and flagrancy of prior misconduct. See *Swanigan*, 279 Kan. at 41-44.

Jami Del Swanigan presented evidence that his intellectual functioning impacted the voluntariness of both interrogations. Swanigan's intellectual functioning was estimated to be in a borderline range. A clinical psychologist placed Swanigan's IQ around 76. The psychologist's report also stated that Swanigan had difficulty with anxiety and anxiety could overwhelm him. The psychologist wrote that Swanigan, "'while in a custodial setting with law enforcement officers[,] is likely not only to feel anxiety but irritability and anger and make statements that may not be in his best interest and may not be true. This would be particularly true if he believed that the officers were being less

53

than [truthful] and wanting to pressure him in a particular way.'" 279 Kan. at 31. These circumstances appeared to be present during Swanigan's interrogation. During the first interrogations, officers misled Swanigan as to the evidence against him, telling him his fingerprints were present when they in fact were not. Officers also represented to Swanigan that they needed him to cooperate to receive more favorable treatment from prosecutors and conversely that failure to cooperate would likely lead to being charged with five robberies as compared to just one if he confessed. Swanigan's story changed in response to State lies or threats. Based on the totality of the circumstances, this court found Swanigan's first statement was involuntary. 279 Kan. at 39.

This court then turned to whether the coercive first interrogation tainted the second. Officers took Swanigan's second statement around 19 hours after his first. Two of the officers involved in the first interrogation were also involved in the second. Both interrogations occurred at the same police station, possibly in the same interrogation room. No evidence suggested any coercive effects attenuated or dissipated since the prior day. The court also noted the prior misconduct was neither physical nor necessarily flagrant. 279 Kan. at 40-44. Even so, under the totality of these circumstances, the court concluded the State "failed to meet its burden of showing the second statement was untainted by the first, i.e., that the second was voluntary as well." 279 Kan. at 44.

Aguirre's interview presented different circumstances. More than three days had passed since his initial interview. Aguirre spent those days in custody. Aguirre makes no argument his intellectual functioning is in a borderline range. Nor does he claim any other mental condition impacted his ability to answer police questions. After more than three days in custody, he understood he was the subject of a double-homicide investigation, not a missing person case. He no longer had a child in his care. And he believed his father and sister to be travelling to him with an attorney, but he decided to

54

talk to police anyway. Given the passage of time and changed circumstances, I conclude the unfairness of the detectives that infected the first interview did not taint Aguirre's second statement. I further conclude Aguirre voluntarily provided his second statement.

Finally, I conclude the trial court's error in allowing the State to use the first statement for impeachment is harmless beyond a reasonable doubt. See *Aguirre I*, 301 Kan. at 962; *Swindler*, 296 Kan. at 684. The second statement largely revisits the same territory covered in the first. Because Aguirre waives any argument that the State could not use a voluntary statement for impeachment, I find no harm arising from the trial court ruling that Aguirre could open the door to the State's use of the first statement. Put another way, any harm resulting from an improper ruling on the first statement was rendered harmless by the admissibility of the second.

For these reasons, I concur in the result even though I would conclude Aguirre's first statement to police was involuntary.