NOT DESIGNATED FOR PUBLICATION

No. 122,850

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SCOTT W. SHAY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed April 1, 2022. Affirmed.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Rebecca Silvermintz*, assistant county attorney, *Elizabeth H. Sweeney-Reeder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., POWELL and ISHERWOOD, JJ.

PER CURIAM: Scott Shay stands convicted of aggravated criminal sodomy for acts committed against 16-year-old S.P. while she was frozen with fear in the back of his horse trailer, which he had converted to a sleeping area. On appeal, Shay argues the State failed to present sufficient evidence to support this conviction. He contends that S.P.'s testimony lacked credibility, the layout of the horse trailer made the acts alleged physically impossible, and there was no physical evidence of oral contact. Each of Shay's arguments can be reasonably interpreted as a request for this court to invade the province of the jury by reassessing witness credibility, reconciling conflicting evidence, and reweighing evidence. This we cannot do. The jury considered all the evidence and

1

concluded that S.P. offered credible testimony about the events of that evening. Shay has not provided us with a lawful basis upon which to set aside that verdict. His conviction is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

C.T. and 49-year-old Scott Shay shared years of a long close friendship. As a product of that relationship, Shay had known C.T.'s daughter, S.P., her entire life. The two became particularly close around the time S.P. turned 10. Shay often took S.P. horseback riding at his farm and she felt secure enough to tell him things that she did not share with anyone else. S.P. trusted Shay and viewed him as a father figure.

In August 2015, to celebrate S.P.'s recent 16th birthday, Shay agreed to chaperone a camping trip for S.P. and her 13-year-old friend, T.M. The trip began with moving cattle at Shay's farm in the afternoon, then the trio headed into Paola to eat. Following dinner, Shay drove the girls to the lake to find a camping site. After finding one, they all went to Shay's home in Hillsdale to retrieve his horse trailer, the inside of which he had converted into sleeping accommodations. Upon their return to the campsite, S.P. asked Shay to purchase alcohol for the three of them. Shay readily agreed and went to a nearby liquor store to purchase twisted lemonades.

The three relaxed and drank at their campsite for a while until S.P. expressed a desire to swim. The group moved down to the water and the girls asked Shay to turn around as they removed their bathing suits, which he did, and the girls then slipped into the lake and swam for a while. Upon their exit from the water, they again instructed Shay to turn around and he complied. After the girls got dressed, Shay accompanied T.M. to the restroom. S.P. remained behind and sat down on a swing. She momentarily lost consciousness and woke up on the ground next to the swing with Shay and T.M. standing over her. S.P. told them she felt disoriented and dizzy and wanted to go to sleep. S.P.

2

retreated to the trailer and went to bed wearing only a tank top and sweatpants. T.M. joined her sometime later.

The sleeping accommodations in the trailer were compact and consisted of two narrow foam beds that were roughly only a third of the size of a typical twin-size mattress. The beds formed an L-shape and S.P. slept on the mattress with her feet facing the entrance while T.M. slept on the mattress perpendicular to S.P.

S.P. woke in the middle of the night to her pants pulled down to her thighs and Shay licking her vagina. Recognizing there were items nearby that Shay could use to hurt her—including a gun—S.P. froze in fear. When he finally stopped, S.P. rolled onto her left side and saw him standing with his back to her. She got up, kicked him, then yelled that she was awake and knew what he did to her. Shay simply told S.P. to quiet down and asked why she did not stop him if she did not want to be touched that way.

S.P.'s yelling woke T.M., and the girls quickly left the trailer. As they walked away, S.P. confided in T.M. about the way Shay touched her. T.M. eventually returned to the trailer to gather their belongings and ignored Shay's efforts to speak to her. T.M. quickly returned to S.P. and then called her mother, L.M.

When L.M. answered the phone around 1 a.m., T.M. was hysterical and asked her mother to come pick them up at the lake. L.M. also heard S.P. screaming in the background. When L.M. picked the girls up, S.P. was still distraught but eventually calmed down. Once they arrived at L.M.'s apartment, S.P. called her mother, C.T., and told her what occurred at the lake. L.M., T.M., and S.M. then walked to the nearby police station, where they were joined by C.T. At the station, S.P. told her mother that she was tired, so she laid down in the trailer to sleep and woke up to Shay "messing with her." S.P. did not share further details with her mother at that time.

Paola Police Officer Nate Smith was the first officer to meet with S.P. and C.T. S.P. repeated that she fell asleep in the trailer and woke up to Shay touching her inappropriately. Smith passed the information along to the investigator on call, Captain Kevin Colwell. Colwell interviewed S.P. around 3 a.m. and she disclosed that Shay licked her vagina. After the interview, S.P. underwent a sexual assault exam with Jacqlynn Asherman, a forensic nurse examiner.

Captain Colwell headed to the lake to find Shay only to find that he had left. Nonetheless, Colwell paused for a few moments to take photos of the campsite. He later located Shay at his home, where he took more photos and then transported Shay to the police station for an interview. Initially, Shay denied all of S.P.'s allegations. Colwell then received information from S.P.'s physical examination and met with Shay a second time. Colwell explained that the forensic examiner found dirt and a gray hair near S.P.'s vaginal area. Shay denied any oral contact and asserted that the gray hair could not be his. Colwell posited that the hair could have come from Shay's mustache, which contained gray hairs. Shay simply shrugged in response.

The State charged Shay with aggravated criminal sodomy under the theory that the assault occurred while S.P. was "overcome by force or fear." The State framed the issue for the jury: "[T]he State will ask you to convict the defendant of aggravated criminal sodomy, aggravated criminal sodomy being the defendant putting his mouth on [S.P.'s] vagina when she was overcome by force or fear, when she was overcome by that fear so that she could not move." At trial, the State presented several witnesses including S.P., T.M., L.M., C.T., law enforcement officers, and two medical professionals.

The State called Asherman, the forensic examiner who administered S.P.'s sexual assault examination. Asherman testified that she asked S.P. to describe what occurred and S.P. explained that she went camping with Shay, who she considered a family friend, and she woke up to Shay licking her genitalia. According to Asherman, the physical

4

examination revealed dirt and what looked like a coiled gray hair on the exterior of S.P.'s vagina. She noted that the hair did not appear to be S.P.'s.

The State also called Rachel Hunt, a forensic biologist at the Kansas Bureau of Investigation. Hunt testified that she completed the DNA testing in S.P.'s case and found DNA matching Shay's on S.P.'s labia minora. Hunt explained that the DNA could have come from many sources but that the DNA she detected could likely be attributed to buccal cells, which are cells found inside the mouth. Hunt acknowledged that they did not test the gray hair.

The jury found Shay guilty of aggravated criminal sodomy and the court sentenced him to serve a prison term of 165 months.

Shay timely filed a notice of appeal.

DID THE STATE PRESENT SUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THAT SHAY COMMITTED AGGRAVATED CRIMINAL SODOMY?

Shay argues the State failed to present sufficient evidence to prove beyond a reasonable doubt that he committed aggravated criminal sodomy by making oral contact with S.P.'s vagina.

*Standard of Review*

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. This court has also recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the

5

inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." [Citations omitted.]'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

ANALYSIS

To sustain a conviction for aggravated criminal sodomy, the State carried the burden to establish that Shay engaged in oral copulation with S.P., without her consent, while S.P. was overcome by force or fear. See K.S.A. 2020 Supp. 21-5504(b)(3)(A).

Shay makes three specific contentions in support of his claim that the State failed to prove the charge beyond a reasonable doubt: (1) S.P. lacked credibility; (2) there was no physical evidence of oral contact; and (3) oral contact would have been physically impossible because of the trailer's confined space. We will address each in turn.

*S.P.'s Credibility*

Shay's first argument essentially asks us to invade the province of the jury. See *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014) ("Sorting out testimonial inconsistencies and evaluating credibility is a function uniquely entrusted to jurors."). Jurors observe witness testimony and the crucible of cross-examination. Such observation is fundamental to distinguishing between truth and falsehood. 49 Kan. App. 2d at 936. "Appellate courts have no comparable vantage point when they read a trial transcript, and that is precisely why they do not make credibility determinations." 49 Kan. App. 2d at 936-37.

Shay asks that we find S.P.'s account was deceptive. To support this claim, he highlights the fact S.P. lied about alcohol consumption that occurred at the lake by downplaying the amount she personally consumed and by telling law enforcement officers that T.M. did not drink any alcohol. Yet these inconsistencies were brought to the

attention of the jury and it still returned a guilty verdict. During cross-examination, S.P. admitted that she initially told law enforcement officers that she only drank three to five twisted lemonades even though she later admitted to drinking six or seven. The State also asked S.P. why she told law enforcement that T.M had not been drinking and S.P. responded, "[W]e were scared that because she was a little bit younger than I was that she would have gotten in more trouble." T.M. confirmed this aspect of S.P.'s testimony during cross-examination.

The reality holds true that the jury, which observed S.P.'s testimony and demeanor, was better positioned than this court to assess S.P.'s overall credibility. See *State v. Estell*, No. 122,158, 2020 WL 7410998, at *4 (Kan. App. 2020) (unpublished opinion) ("Inconsistency in a witness' testimony does not necessarily render the evidence insufficient to support a conviction. It was within the province of the jury to evaluate whether [the witness] was telling the truth when [a detective] interviewed her or when she testified later at trial."). Any assessment the jury made regarding S.P.'s credibility necessarily included the two falsehoods Shay references on appeal. We decline to step into the shoes of the jury and formulate an alternate conclusion.

The second credibility issue Shay cites is that S.P. provided varying accounts of the assault and did not mention oral contact until her interview with Captain Colwell. S.P.'s lengthy meeting with Colwell marked the fifth time she spoke of the assault and likely the first time anyone asked investigatory questions rather than basic inquiries. During the exchange, S.P. provided a comprehensive account of the evening and fleshed out other details including the trailer's sleeping arrangements and that the abuse she endured involved oral contact with her vagina.

When S.P. spoke to Asherman she was called on to detail the incident for a sixth time. S.P told Asherman that Shay licked her genitals, which matched what she told

Captain Colwell. Thus, despite Shay's contentions to the contrary, S.P.'s account of the aggravated criminal sodomy remained consistent.

In his quest for relief, Shay directs our attention to *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983). In that case, our Supreme Court reversed Matlock's rape conviction after it concluded the State failed to satisfy its burden to establish the crime beyond a reasonable doubt. 233 Kan. at 5-6. Matlock's stepdaughter accused Matlock of rape and alleged it occurred on a creaky bed. A jury convicted Matlock even though four witnesses present in the house at the time of the alleged offense testified they did not hear or see anything to support the stepdaughter's accusation. One witness testified that he saw Matlock enter his bedroom around an hour before the alleged assault. The same witness testified that he had an unobstructed view of the accuser's bedroom door and never saw Matlock enter or leave that room.

On appeal, the *Matlock* court reiterated that while the testimony of the accuser is, on its own, typically sufficient to uphold a conviction even if there is no corroboration, that principle falters when the testimony "is so incredible and improbable as to defy belief." 233 Kan. at 3; see also *State v. Cooper*, 252 Kan. 340, 347, 845 P.2d 631 (1993) ("The common-law rule that testimony of the prosecutrix alone can be sufficient to sustain a rape conviction without further corroboration as long as the evidence is clear and convincing and is not so incredible and improbable as to defy belief has not been modified.").

After reviewing the facts, the court highlighted 14 factors that illustrated how the stepdaughter's testimony defied belief and lacked the credibility required to enable "a rational factfinder could find the defendant guilty beyond a reasonable doubt." 233 Kan. at 4-6.

Shay argues that S.P.'s testimony lacks credibility in a similar fashion. But the record before us reflects that Shay's case falls well far afield from *Matlock*. First, several pieces of evidence corroborated S.P.'s account. To begin with, Shay and the girls were alone in a trailer in an isolated location in the middle of the night, allowing him to commit the sex acts undetected. Further, S.P. provided a consistent account of the oral conduct to Captain Colwell and Asherman. During her exam, Asherman collected a gray hair, much like Shay's facial hair, from S.P.'s genital region. Finally, Hunt testified that DNA, potentially from buccal cells and consistent with Shay's, was found on S.P.'s labia. See *State v. Hill*, No. 116,439, 2017 WL 4216083, at *4 (Kan. App. 2017) (unpublished opinion) (declining to apply *Matlock* and finding "it was appropriate for the jury to determine [a witness'] credibility and to weigh her testimony against the other evidence presented at trial," particularly when "other evidence corroborated much" of the witness' testimony); *State v. Burgos*, No. 84,760, 2001 WL 37131694, at *2 (Kan. App. 2001) (unpublished opinion) (declining to apply *Matlock* because, among other things, other evidence corroborated the sexual abuse).

Second, many of the problematic factors present in *Matlock* are absent here. The *Matlock* court emphasized the creakiness of the bed, which anyone in the home could have heard had the attack occurred as alleged, and the fact that no one heard the victim's purported loud cries following the alleged attack. These facts, along with the testimony of four witnesses who were present in the home and did not see or hear an assault, led the court to conclude the stepdaughter's testimony lacked credibility. Here, S.P. did not move or make any noise during the assault. Asherman informed the jury that such reactions are normal and often called "tonic immobility," affecting roughly 70 percent of people experiencing sexual assault. See Allen, *The Emotional Woman*, 99 N.C. L.R. 1027, 1061 (2021) ("Tonic immobility is a natural response to trauma that occurs in animals and humans alike. It is characterized by physical immobility, muscular rigidity, and lack of response to stimulation. Further, it is a common response to sexual assault."); Brooks, *But She Didn't Fight Back: Rape Law's Lingering Resistance Requirement and the Need for*

*Its Elimination*, 55 Crim. Law Bulletin, No. 3, Art. 3, Part IV.B. (2019) ("A recent 2017 study that was the first of its kind in studying tonic immobility in sexual assault victims found that it was a common reaction—69.8% of the respondents reported significant immobility during the assault, and 47.7% reported extreme immobility."). *Matlock* is a poor analogue and does not entitle Shay to a reversal of his valid conviction. See *State v. Brinklow*, 288 Kan. 39, 53, 200 P.3d 1225 (2009) (noting that *Matlock* was an "aberrant" decision and "perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix to reverse a conviction for rape").

We decline to invade the province of the jury and conduct an independent assessment of the victim's credibility. Rather, we respect and defer to the jury's conclusion on that matter.

*Lack of Physical Evidence*

Shay next argues that the State's case rose and fell on S.P.'s testimony alone and that it failed to offer any physical evidence to corroborate the aggravated sodomy allegations. But the evidence presented to the jury and, correspondingly, the record before us, includes four references to physical evidence that substantiate S.P.'s claims.

First, Asherman, the forensic examiner who conducted S.P.'s sexual assault examination, testified that she found a coiled gray hair on the exterior of S.P.'s vagina. The hair and other fibers collected during the examination are considered "trace evidence," but were not submitted for testing because, at the time, the KBI did not have a trace section. She passed information about the discovery of the hair on to Captain Colwell, who mentioned it to Shay during their second interview. When Colwell questioned Shay about whether the source could have been Shay's facial hair given that he was graying, Shay merely shrugged in response.

Second, Hunt, a KBI forensic biologist, testified about DNA collected from S.P.'s labia that matched Shay's DNA. She also informed the jury that while she cannot "make identification as to the source of that DNA," she believed buccal cells were the source in S.P.'s case.

The jury contemplated all this evidence. It evaluated Asherman's and Hunt's testimonies and viewed a video recording of Shay's interviews with Captain Colwell. Thus, it necessarily had the opportunity to consider physical evidence along with S.P.'s testimony. In the end, it chose to believe S.P.'s account. We decline Shay's invitation to reweigh the evidence.

*Physical Impossibility*

Finally, Shay contends that the cramped conditions of the trailer and the position of S.P.'s body as she slept on her stomach rendered it physically impossible to sodomize S.P. as she alleged. He points us to S.P.'s testimony, noting that she "was adamant that she was on her stomach and kept both legs and feet together during the entirety of the encounter."

We are not persuaded. Exhibits B and C in the record show an open space in the middle of the "L" created by the mattress formation. The dimensions of that space were the length of T.M.'s mattress by most of the length of S.P.'s mattress. Thus, it is more than enough space for an adult man to maneuver about. We also note that Shay misrepresents S.P.'s statements to some degree. S.P. did not "adamant[ly]" testify that she held her legs together. Rather, during direct examination S.P. simply stated that "[Shay] would kind of like—felt like he would pull my thigh like, he would pull it to the side . . . ." On redirect, she confirmed that Shay separated her legs to perpetrate the assault.

11

The amount of available space, as well as S.P.'s testimony that Shay manipulated her body during the assault, undermine Shay's contention that the assault was physically impossible. As the State points out, the jury had the opportunity to view photographs of the scene along with the size of the individuals physically present in the courtroom and conclude whether the dimensions of the trailer made the assault unlikely. Even if we were permitted to reweigh the evidence, which we are not, we are not in the position to do so from a cold record that does not offer us the same vantage point the jury enjoyed.

Taken together, Shay's arguments are unpersuasive and run expressly contrary to the limitations posed by the governing standard of review. When viewed in a light most favorable to the State, the evidence is sufficient for a reasonable fact-finder to conclude beyond a reasonable doubt that Shay committed aggravated criminal sodomy. The jury considered the entirety of the State's evidence and concluded it was persuasive. We decline to set his valid conviction aside.

Affirmed.