NOT DESIGNATED FOR PUBLICATION

No. 124,091

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDWARD C. BEDDINGFIELD JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed August 26, 2022. Affirmed in part and dismissed in part.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jon Simpson*, assistant district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., COBLE, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: Edward Beddingfield Jr. appeals his convictions for possession of methamphetamine and criminal trespass. He makes three claims: there was insufficient evidence that he was trespassing, his detention was unlawful, and the search of his bag was unlawful. Our review of the record reveals that the owner of the building found Beddingfield, who was not a tenant, sitting in the hall. He asked him to leave, but Beddingfield did not leave. Next, Beddingfield has not preserved his claim of illegal detention for appellate review. And, finally, once the police arrested him for trespassing, the discovery of methamphetamine in his bag—which was in the officer's plain view— was inevitable.

1

We affirm in part and dismiss in part.

*Police are dispatched to remove someone from an apartment building.*

Early one evening in January 2018, Officer Brett Schneider was dispatched to an apartment building in Lawrence to remove someone sitting in the hallway who was believed to be trespassing. The owner of the building, James Dunn, had called police. This was a routine call on the property. The individual was later identified as Beddingfield. Dunn did not seem to remember much about this incident but testified that the building was private property and that he "always" asked a person on the property to leave if a resident of the building was not hosting them. He always asked the person: "[W]hy they're there; who they are; what are they doing." Dunn testified he did not know Beddingfield—as far as he knew, Beddingfield did not have permission to be on the property—and he asked Beddingfield to leave the property. Dunn did not recall Beddingfield's response.

When Officer Schneider arrived, Dunn led him to Beddingfield. Dunn told the officer that "the guy wasn't making any sense, and that he had asked him to leave." Beddingfield was sitting on the ground leaning against a wall. Officer Schneider asked Beddingfield if he belonged there, informed him that Dunn wanted him to leave, and asked him for his identification. Beddingfield did not respond to the officer. Officer Schneider repeated himself several times. The officer told Beddingfield he needed to leave, or he would be arrested. Beddingfield had a bag underneath his right arm he was trying to conceal. When Officer Schneider asked for his ID, Beddingfield "kind of reached towards his bag." The officer did not feel safe because it was close quarters. He told Beddingfield not to reach inside the bag. Instead, the officer asked where his ID was. But "if [Beddingfield] was trying to speak, it was very hard to understand. He had really bloodshot and watery eyes." The officer felt that Beddingfield was impaired.

When Beddingfield reached toward the bag again, the officer pulled the bag away from him. As Beddingfield started to get up, a glass pipe fell from his person and broke when it hit the ground. The officer "didn't see it initially." Officer Schneider and another officer then put Beddingfield in handcuffs because Beddingfield "kept just reaching for areas." It was close quarters—a 4-foot by 4-foot hallway. The officers wanted to control his hands. Officer Schneider had asked Beddingfield several times for his identification and "at that point I would have rather found his identification versus have him search for it."

Once Beddingfield was detained, Officer Schneider noticed Beddingfield's bag was lying on the ground with the front zipper pouch open. Officer Schneider testified he did not pull it open, but "just glanced in plain view, looked inside the bag. I was mainly looking for weapons." The officer testified, "I glanced inside the bag, and very quickly inside of a front pouch there was a . . . clear baggie with a white crystal substance in it." He saw the glass pipe that had fallen to the ground and suspected that Beddingfield was impaired on some type of drug. The substance was later confirmed to be methamphetamine.

Beddingfield was arrested for trespassing and taken to jail. The officer testified that after Beddingfield was arrested, he could not leave the backpack in the hallway and he had to open the other compartments to check for potentially dangerous items. Because the jail storage was over capacity, he had to put the backpack into evidence. According to policy, he had to go through it to make sure there were no liquids or food that would make a mess. But he did not go through Beddingfield's personal papers "because it wasn't [his] business." He did find a citation in the bag with Beddingfield's name on it.

*Beddingfield moves to suppress evidence.*

Beddingfield was charged with possession of methamphetamine, possession of drug paraphernalia, and criminal trespass. Beddingfield's motion to suppress listed five facts and then simply stated: "The Defendant does not believe this was a lawful search." The State pressed Beddingfield's counsel to explain the basis for the motion before trial so the relevant facts could be explored. Defense counsel eventually explained that "it comes down to where of this alleged baggie was in the backpack."

At trial, Officer Schneider used Beddingfield's backpack to show the court how it was positioned with its front pouch opened when he saw the baggie of methamphetamine. The court examined the baggie. The front pouch of the backpack was 3 or 4 inches deep. The baggie of methamphetamine was on top of some personal papers and "easy to see." The officer testified he did not have to touch or maneuver anything to see it. At the time of day, the sun was getting low. "It was a darker or very low light area."

After the witnesses testified, defense counsel argued, "[I]t's not feasible that that item was in plain view." Defense counsel further argued the drugs would not have been found when the bag was taken into evidence. The State argued that it was feasible that the officer saw the drugs in plain view, noting that the pocket on the backpack "does gap open. . . . [Y]ou can clearly see right into that pocket . . . [because of] the way that pocket on the backpack is manufactured evidently." The State also argued the officer had to go through the bag according to policy once he got to the jail to make sure there were no weapons or spoilable food or liquids.

The trial court ruled that Officer Schneider's description of how he glanced down at the backpack and saw the baggie of methamphetamine was "very believable." The court found Officer Schneider credible. The court "didn't have any sense that he was trying to over explain anything or recall any circumstances that would fit." Looking at the

4

backpack, the court found that "the baggie was positioned in such a fashion relative to [the other] items, that it was evident and in plain view of the officer" and there was no evidence to the contrary. The court further found that it was reasonable for the officer to conclude the white substance in the small Ziploc baggie in plain view was a narcotic.

The court found Beddingfield guilty of all charges and sentenced him to 18 months in prison. Beddingfield appeals.

*There was sufficient evidence Beddingfield was trespassing.*

Beddingfield contends the record lacks evidence that Dunn asked Beddingfield to leave the property or even remembered the encounter. He contends there was no evidence he lacked authority to remain on the property. Beddingfield was in a common area of the apartment building and may have been authorized to be there by one of the tenants.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. 313 Kan. at 209.

As charged here, criminal trespass is "entering or remaining upon or in" a structure "by a person who knows such person is not authorized or privileged to do so" and the person "enters or remains therein in defiance of an order not to enter or to leave such premises or property personally communicated to such person by the owner thereof or other authorized person." K.S.A. 2021 Supp. 21-5808(a)(1)(A).

Generally, a social guest of an apartment resident does not have property rights in the residence but may be given permission to enter or remain on the property. See *State v.*

*Williams*, 308 Kan. 1439, 1445, 430 P.3d 448 (2018). Dunn testified that the building was multifamily housing and private property—only open to residents and individuals being hosted by a resident.

Dunn did not seem to remember much, if anything, about this incident but testified that he "always" asked people to leave if a resident of the building was not hosting them. Dunn testified he did not know Beddingfield. When asked if he told Beddingfield to leave the property, Dunn responded:  "Yes. Anyone in there that doesn't have a host, and they don't know why they're there, they're always asked to leave the property." He testified that he only called the police when a person would not leave.

Officer Schneider did remember the incident and testified that he was dispatched because Dunn had asked someone to leave and wanted them removed from the property. The officer also testified that when he arrived Dunn confirmed that he had asked Beddingfield to leave. But Beddingfield was still there when the officer arrived. Beddingfield never asserted that he was authorized to be there, and he was not accompanied by a resident of the building.

In sum, the apartment building was private property. The owner of the building did not recognize Beddingfield and had asked him to leave. When Officer Schneider arrived, he also asked Beddingfield to leave. Beddingfield was not with a tenant of the building and did not assert he had a right to be there. Construing this evidence in a light most favorable to the State, a rational fact-finder could have found beyond a reasonable doubt that Beddingfield remained in the apartment building knowing he could not be there and in defiance of an order to leave from the owner.

*Whether Beddingfield's restraint was unreasonable was not preserved for our review.*

Beddingfield contends his detention was unlawful. He contends the officer "seemingly created his own exigency by demanding Mr. Beddingfield's identification and then getting a bad 'feeling' when Mr. Beddingfield attempted to comply." His movements responded to officers' questions, and he was not aggressive or hostile. He also contends the seizure of his bag was unlawful because no evidence of criminal trespass could have been found within his bag and there was no officer-safety reason to move his bag. He argues he is not contesting any relevant facts and therefore this court can exercise de novo review.

In general, "investigatory detentions are constitutionally permissible if an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime." *State v. Hanke*, 307 Kan. 823, 828, 415 P.3d 966 (2018). Investigatory detentions "'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *State v. Doelz*, 309 Kan. 133, 139, 432 P.3d 669 (2019). The standard for what is reasonable is based on all the circumstances and is made with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances. But the officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Hanke*, 307 Kan. at 828-29. The officer must be able to point to particular facts from which the officer reasonably inferred that the individual was armed and dangerous. *State v. Johnson*, 293 Kan. 959, 966, 270 P.3d 1135 (2012).

Beddingfield claims these issues were preserved because he moved to suppress the evidence, stating that Officer Schneider's search was unlawful because of an illegal search and seizure. The State argues that Beddingfield did not preserve these issues for appellate review.

Generally, issues not raised before the trial court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Kansas Supreme Court Rule 6.02(a)(5) requires that, in an appellant's brief, "[e]ach issue must begin with . . . a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." (2022 Kan. S. Ct. R. at 36). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal. But Supreme Court Rule 6.02(a)(5) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). That requirement is strictly enforced. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). Appellate courts exercise unlimited review over whether a party properly preserved an issue for appellate review. *State v. Ton*, 308 Kan. 564, 570, 422 P.3d 678 (2018).

It is also true that a defendant cannot raise on appeal a different theory for suppression of evidence than argued to the trial court. K.S.A. 22-3216(2) requires a defendant seeking to suppress evidence to file a written motion that "state[s] facts showing wherein the search and seizure were unlawful. The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were lawful shall be on the prosecution."

In *State v. Estrada-Vital*, 302 Kan. 549, 557-58, 356 P.3d 1058 (2015), the defendant argued his fruit-of-the-poisonous-tree argument was preserved for appeal though he did not raise it below because all the facts to support the theory were set out in his suppression motion and he needed to do nothing further. He argued the State had to refute all possible theories of unlawfulness and the trial court was expected to connect the dots between the stated facts to intuit the defense's theory of how the defendant's Fourth Amendment rights were violated. Our Supreme Court did not resolve that question because the defense counsel had made affirmative stipulations that prevented the factual inquiry below necessary to resolve the issue on appeal. 302 Kan. at 557-58.

Beddingfield did not make these arguments before the trial court, and he does not explain why this court should consider these issues for the first time on appeal. Although he filed a general motion to suppress, he clarified at trial that his argument concerned only whether the drugs were in plain view. In other words, he affirmatively narrowed the scope of his argument. The trial court only considered and ruled on that aspect of the search and seizure.

Beddingfield's description of the facts in his appellate brief is far more involved than his bare bones description of the facts in his motion to suppress. The motion does not mention Beddingfield reaching toward his bag to get his identification. To make his argument on appeal, Beddingfield characterizes his movements as compliance with the officer's directions, but the officer testified to the contrary. Officer Schneider testified that he did not believe Beddingfield was reaching for his bag to get his identification—rather, the officer said he "realized that [Beddingfield] wasn't, you know, getting me that." The officer testified Beddingfield was making "furtive movements" and "concealing the bag." He testified he moved the bag only after Beddingfield reached for the bag again after being instructed not to reach inside the bag. Whether Beddingfield's movements were compliant or concerning is disputed. The officer repeatedly contended that he was concerned for his safety.

We cannot weigh evidence, make determinations of credibility, or make findings of fact necessary to resolve this issue. We will not consider these arguments for the first time on appeal. We dismiss this part of the appeal.

*There was substantial competent evidence that the drugs were in plain view.*

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches are per se unreasonable unless they fall within one of the exceptions to the warrant requirement. *State v. Hubbard*, 309 Kan. 22,

9

33, 430 P.3d 956 (2018). Under the plain-view doctrine, police may seize a plainly viewed object without a warrant if:

- (1) the police officer is lawfully at the location and position from which the object was plainly viewed;
- (2) the incriminating character of the object is immediately apparent from the police officer's plain-view observation; and
- (3) the police officer has a lawful right of access to the place and position at which the object may be seized.

*Doelz*, 309 Kan. 133, Syl. ¶ 2.

Beddingfield argues only that the drugs were not immediately apparent. Beddingfield contends that Officer Schneider's "uncorroborated and conclusory testimony" is not substantial competent evidence that the drugs were in plain view. He points to the low-light conditions, the disarray of the bag, the papers in the bag, and Officer Schneider's use of the words "plain view" in his testimony. He contends uncorroborated officer testimony should be carefully tested, not blindly accepted.

Here, the trial court did carefully consider Officer Schneider's testimony. The court noted that this "wasn't exactly [a] well lit area," that Officer Schneider was standing, and that the backpack contained some of Beddingfield's personal papers. The trial court found Officer Schneider "very believable," noting that the officer did not appear to "over explain anything or recall any circumstances that would fit." The trial court was able to observe the position and size of the pocket on the backpack itself and examine the baggie as Officer Schneider testified, which we cannot do. Hearing the testimony and viewing the evidence, the trial court found it believable that the baggie was positioned in such a way relative to the other items in the bag that it was in plain view of the officer and that it was reasonable for the officer to believe the substance in the baggie was a narcotic.

We did not have an opportunity to view any of the evidence as the trial court did. This court cannot reweigh evidence or redetermine the credibility of witnesses. In this case, the officer's undisputed testimony was sufficient to support a finding that the methamphetamine was in plain view.

Affirmed in part and dismissed in part.